UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------ x
   UNITED STATES OF AMERICA,               :

                                                  :
                    Petitioner,                 :        18 Misc. _____

                       - v -                          :

                                                  :
   ANTHEM, INC.,                         :

                     Respondent.                :
------------------------------------------------------------------ x

## MEMORANDUM OF LAW IN SUPPORT OF THE GOVERNMENT'S PETITION TO ENFORCE COMPLIANCE WITH CID 18-46

                                                              GEOFFREY S. BERMAN
                                                              United States Attorney for the
                                                              Southern District of New York
                                                              86 Chambers Street, 3rd Floor
                                                              New York, NY 10007
                                                              Telephone: (212) 637-2734/2697

Of Counsel:

  LI YU
  PETER ARONOFF
Assistant United States Attorneys

# TABLE OF CONTENTS

                                            **PAGE**

**PRELIMINARY STATEMENT** ............................................................................................................. 1

**RELEVANT BACKGROUND** ............................................................................................................... 3

    A.  Medicare Risk-Adjustment Payments to Part C Plan Sponsors Like Anthem ....................... 3

    B.  For Risk-Adjustment Purposes, Anthem Reported to CMS the Diagnosis Codes
        Submitted by Service Providers and Generated by Its Chart Review Vendor ...................... 4

    C.  Anthem Has Profited from Its Choice to Not Correct or Withdraw the Provider-
        Submitted Diagnosis Codes That Are Not Supported by Chart Review Results ................... 6

    D.  To Expedite the Investigation, CID 18-46 Seeks Testimony That Provides an
        Overview of the Policies and Processes at Anthem Relating to the Validity of
        Its Risk-Adjustment Data Submissions to CMS ................................................................... 7

**ARGUMENT** ........................................................................................................................................ 9

**POINT I**    THE STANDARD FOR CID ENFORCEMENT UNDER THE FCA ............................................. 9

**POINT II**   THE GOVERNMENT IS ENTITLED TO ENFORCEMENT OF CID 18-46 ................................ 10

    A.  The Government's Investigation Is Within the Jurisdiction Provided by the FCA ............. 10

    B.  The Testimony Sought by CID 18-46 Regarding Anthem's Policies and Processes
        Is Relevant to the Matters under Investigation .................................................................... 11

    C.  It Is Not Unreasonable or Unduly Burdensome to Require Anthem to Provide
        Testimony Regarding Topics Directly Related to Its Annual Attestations ......................... 13

    D.  Anthem Is Not Entitled to Evade Potential FCA Liability by Imposing Unreasonable
        Limits on CID Testimony and Delaying the Investigation ................................................. 14

**CONCLUSION** ................................................................................................................................... 15

# TABLE OF AUTHORITIES

**CASES** **Page**:

*20th Century Fox Film v. Marvel Enterprises*,
   01 Civ. 3016 (AGS)(HB), 2002 WL 1835439 (S.D.N.Y. Aug. 8, 2002) ..................................... 14

*Buycks-Roberson v. Citibank*, 162 F.R.D. 338, 343 (N.D. Ill. 1995) .............................................. 14

*EEOC v. Kloster Cruise Ltd.*, 939 F.2d 920 (11th Cir. 1991) ......................................................... 10

*FTC v. Texaco*, 555 F.2d 862 (D.C. Cir. 1977) ................................................................................ 13

*N.L.R.B. v. Am. Med. Response, Inc.*, 438 F.3d 188 (2d Cir. 2006) .............................................. 10

*Sandsend Fin. Consultants, Ltd. v. Fed. Home Loan Bank Board*,
   878 F.2d 875 (5th Cir. 1989). .................................................................................................... 11

*SEC v. Brigadoon Scotch Distr. Co.*, 480 F.2d 104 (2d Cir. 1973) ................................................ 13

*United States v. Oncology Services Corp.*,
   60 F.3d 1015 (3d Cir. 1995) ...................................................................................................... 11

*United States v. AGS Solutions Corp.*,
   17-CV-1224 (BGS), 2018 WL 1418023 (S.D. Cal. Mar. 22, 2018) ......................................... 9

*United States v. Markwood*, 48 F.3d 969 (6th Cir. 1995) ......................................................... 9, 15

*U.S. ex rel. Swoben v. United Healthcare*,
   848 F.3d 1161, 1167 (9th Cir. 2016) ................................................................................ *passim*

*United States v. Morton Salt Co.*, 338 U.S. 632 (1950) .............................................................. 2, 14

*United States v. Neifert-White, Co.*, 390 U.S. 228 (1968) .............................................................. 10

*United States v. Powell*, 379 U.S. 48 (1964) ..................................................................................... 9

*United States v. Time Warner, Inc.*,
   Misc. A 94-338, 1997 WL 118413 (Jan. 22, 1997 D.D.C.) ..................................................... 13

*United States v. Witmer*, 835 F. Supp. 208 (M.D. Pa. 1993) ......................................................... 10

**STATUTES**

31 U.S.C. § 3731(b) ..................................................................................................................... 8, 15

31 U.S.C. § 3733 ............................................................................................................................ 1, 9

**REGULATIONS**

42 C.F.R. § 422.503(b)(vi) ....................................................................................................... *passim*

## PRELIMINARY STATEMENT

By this petition, the United States (the "Government") seeks to enforce provisions of the False Claims Act, 31 U.S.C. § 3729 *et seq*. (the "FCA"), that authorize the Government to obtain "oral testimony" that is "relevant to a false claims law investigation," *id*. § 3733(a)(1). Here, the Government is investigating whether respondent Anthem, Inc. ("Anthem"), which sponsors dozens of Medicare Part C insurance plans, has unlawfully obtained upwards of hundreds of millions of dollars in Medicare risk-adjustment payments while knowingly disregarding its duty to ensure the validity of data it submitted to Medicare for purposes of calculating these payments. *See generally U.S. ex rel. Swoben v. United Healthcare*, 848 F.3d 1161, 1167 (9th Cir. 2016) (recognizing that Part C plan sponsors can be liable under the FCA if they deliberately "avoid identifying erroneously submitted diagnosis codes that might otherwise have been identified with reasonable diligence").

In March 2018, the Government issued a civil investigative demand to Anthem ("CID 18-46") to obtain testimony from a corporate representative about, as relevant here, the policies, procedures, training, and personnel at Anthem responsible for ensuring the validity of the diagnosis data being submitted to the Centers for Medicare and Medicaid Services ("CMS"), which CMS uses to determine the correct amount of monthly payments to Anthem for each Medicare Part C beneficiary. As Anthem knows, CID 18-46 seeks testimony pertaining to policies and processes at Anthem for handling the diagnosis data it received from *two* sources — *one*, the diagnosis codes in "claims data files" that health service providers submitted to Anthem; and, *two*, the diagnosis codes generated through review of medical records through Anthem's "retrospective chart review" program. *See infra* at 4-8. As the Ninth Circuit has recognized, a Medicare Part C plan sponsor like Anthem can contravene its annual attestations – and violate the FCA – by deliberately ignoring the red flags that the retrospective chart review results raise as to the validity of the provider-submitted diagnosis codes. *See Swoben*, 848 F.3d at 1173-74 (a

plan sponsor has FCA liability if it deliberately fails to ensure the diagnosis codes "unsupported by the retrospective reviews [are] corrected and withdrawn from the Government"). Anthem's policies and procedures on whether and how to vetted diagnosis data it submitted to CMS are, therefore, highly relevant to the Government's assessment of Anthem's liability under the FCA.

Anthem, however, is refusing to provide testimony about what policies and processes, if any, it utilized to ensure the validity of the provider-submitted diagnosis codes. There is no legal basis for this position. As recognized in *Swoben*, whether Anthem investigated the validity of provider-submitted diagnosis codes that are "unsupported by" chart review results and then made the necessary corrections is at the core of FCA liability. *See* 848 F.3d at 1167. The Government, accordingly, is entitled to testimony about Anthem's policies and processes relating to the validity of provider-submitted diagnosis codes. Such testimony not only may shed light directly on Anthem's *scienter*, but it also may allow the Government to assess *scienter* by examining whether Anthem complied with or contravened its own policies, processes, and attestations. *See infra* Pt. II.B. Anthem's refusal to comply with CID 18-46, therefore, intrudes on the Government's "legitimate right to [ascertain whether] corporate behavior is consistent with the law," *United States v. Morton Salt Co.*, 338 U.S. 632, 652 (1950).

Further, the current procedural posture supports enforcement of CID 18-46. The Government seeks testimony to understand and assess Anthem's conduct and *scienter* on an *expedited* basis due to Anthem's decision in March 2018 to stop extending an FCA tolling agreement. *See infra* at 7-8. While Anthem has the right to stop tolling FCA claims, it is not then entitled to evade liability by refusing to offer relevant testimony in response to a CID and thereby unfairly impeding the Government's ability to conduct a timely investigation. Accordingly, the Court should grant this petition and order Anthem to provide testimony by October 2, 2018, concerning its policies, procedures, training and personnel for ensuring the validity of provider-submitted diagnosis codes. *See infra* Pt. II.D.

## RELEVANT BACKGROUND

### A. Medicare Risk-Adjustment Payments to Part C Plan Sponsors Like Anthem

Medicare Part C, also known as the Medicare Advantage program, allows Medicare beneficiaries to opt out of the traditional Medicare program (*i.e.*, Part A and Part B) and instead enroll in Part C plans that provide PPO and HMO coverage. The Part C plans – sponsored by insurance carriers like Anthem[1] – must provide Medicare beneficiaries with coverage for all the services they would otherwise be entitled to receive under traditional Medicare.

Under Medicare Part C, plan sponsors like Anthem contract with CMS to cover services in return for monthly payments for each beneficiary. CMS makes these capitated payments on a risk-adjusted basis — meaning that the payments are, in Anthem's own words, "based on demographics (*i.e.*, age and sex) as well as actual health status of [the beneficiary]." *See* Medicare Advantage Risk Adjustment Programs at 4.[2]

More specifically, and as described in Anthem's own guidance, CMS calculates a "risk score [] based on a combination of demographic and disease data," with the demographic data "provided [] by the Social Security Administration, while the disease data is submitted by [Anthem] in the form of diagnosis codes." *Id*. at 5. According to Anthem, two formulas capture the relationship between the diagnosis data and the risk-adjustment payments:

$$\textbf{Risk Score} = (\text{demographics}) + (\text{disease}) + (\text{disease}) + (\text{disease})$$

$$\textbf{Total Payment} = \text{Base Payment} \times \text{Risk Score}$$

*See id*. Put simply, the amount of risk-adjustment payments that Anthem receives from CMS is directly linked to the number and severity of the diagnosis codes it reports to CMS.

---

[1] Anthem transacts business in this District by sponsoring, through its Empire Choice affiliates, two or more Part C plans that are marketed to Medicare beneficiaries in New York.

[2] A copy of this Anthem record is attached as Exhibit 3 to the Declaration of Li Yu dated August 20, 2018 (the "Yu Decl.").

As the Ninth Circuit recognized, Part C plan sponsors like Anthem have "a financial incentive to exaggerate an enrollee's health risks by reporting diagnosis codes that may not be supported by the enrollee's medical records." *Swoben*, 848 F.3d at 1166. To counter this incentive and prevent improper overpayments, CMS requires Anthem and other Part C plan sponsors to ensure the accuracy and validity of their diagnosis code submissions.

Specifically, since 2000, CMS has put Part C plan sponsors like Anthem on notice that they owe "an obligation to undertake 'due diligence' to ensure the accuracy, completeness, and truthfulness of [the risk-adjustment] data submitted to CMS" and will therefore "be held responsible for making good faith efforts" to do so. *See* Medicare + Choice Programs 65 Fed. Reg. 40,170, 40,268 (June 29, 2000); *see also Swoben*, 848 F.3d at 1166-67. CMS also promulgated regulations requiring Anthem and other Part C plan sponsors to maintain "an effective compliance program," including policies, procedures, and standards of conduct," designed to "prevent, detect, and correct non-compliance with CMS' program requirements as well as … fraud, waste, and abuse." *See, e.g.*, 42 C.F.R. § 422.503(b)(vi).

Moreover, CMS has mandated the submission of annual attestations by Part C plan sponsors concerning the accuracy of their risk-adjustment data submissions. *See* 42 C.F.R. § 422.504(l). As relevant here, Anthem officers and executives executed annual attestations for the Part C plans sponsored by Anthem, certifying to CMS, *inter alia*, that "all information submitted to CMS" by Anthem for risk-adjustment purposes "is accurate, complete, and truthful" to Anthem's "best knowledge, information, and belief." *See, e.g.*, Attestation of Risk Adjustment Data Information of Healthkeepers, Inc. (H0147) dated June 8, 2016 (Yu Decl. Ex. 2).

### B. For Risk-Adjustment Purposes, Anthem Reported to CMS the Diagnosis Codes Submitted by Service Providers and Generated by Its Chart Review Vendor

Anthem receives diagnosis codes submitted by health service providers when these providers seek insurance coverage for treating Medicare beneficiaries who are enrolled in Part C

plans sponsored by Anthem. At Anthem, these provider-submitted diagnosis codes are collected in the "claims data files." Anthem then periodically submits those diagnosis codes to CMS as part of the risk-adjustment process.

As Anthem knows, the fact that a diagnosis code is reported by a service provider or appears in a medical record is not by itself sufficient to meet CMS's guidelines for risk-adjustment submission. For example, Anthem's own guidance emphasizes that "[c]onditions coded must be stated in the medical record using text," and conditions that are "documented using only numerical ICD-9 codes are not acceptable for risk adjustment per CMS." *See* Medicare Advantage Risk Adjustment Programs at 7 (Yu Decl. Ex. 3). Similarly, to qualify for risk-adjustment submission, a diagnosis "must result from a face-to-face visit either with an acceptable physician specialty or from an acceptable facility." *Id*.

In addition to the provider-submitted claims data, Anthem also receives risk-adjustment diagnosis codes from Verscend, a vendor that Anthem has used since in or about 2010[3] to conduct "retrospective chart review" of medical records of beneficiaries enrolled in Anthem's Part C plans. Anthem pays Verscend to first obtain from health service providers the medical records for beneficiaries selected by Anthem and then review those records to identify all the diagnosis codes "that are *properly documented* and addressed in [] the medical record for each date of service." *Id*. at 4 (emphasis added).

On a monthly basis, Anthem receives "data files" from Verscend containing the diagnosis codes generated by the retrospective chart review process.[4] Anthem uses a data processing program called SAS to determine which of the diagnosis codes identified by

---

[3] Until in or about 2014, Verscend did business as MediConnect.
[4] As its name suggests, the retrospective chart review process normally occurs a number of months *after* Anthem has reported the provider-submitted diagnosis codes to CMS.

Verscend have not already been reported to CMS based on the provider-submitted claims data. Anthem then submits those additional diagnosis codes to CMS.[5]

### C. Anthem Has Profited from Its Choice to Not Correct or Withdraw the Provider-Submitted Diagnosis Codes That Are Not Supported by Chart Review Results

Anthem actively tracks whether it is profiting from risk-adjustment activities like retrospective chart reviews. For example, Anthem's finance and actuarial staff have regularly prepared "ROI" analyses (*i.e.*, return-on-investment) to compare the additional payments generated by its risk-adjustment activities against the relevant expenditures. According to its ROI analysis, Anthem's retrospective chart review program has been highly profitable.

For 2014, for instance, Anthem obtained more than $102 million in "program revenue" – in the form of additional risk-adjustment payments from CMS – as result of retrospective chart review, while incurring only $18.1 million in "program expense." *See* Yu Decl. Ex. 4. And, for 2015, retrospective chart review generated more than $112 million in "program revenue" while costing only $18.8 million in "program expense." *See* Yu Decl. Ex. 5. The "program revenue ROI" for chart review was 5.64 and 6.00 in 2014 and 2015, respectively — put differently, each dollar Anthem spent on its retrospective chart review program generated more than $5 in additional risk-adjustment payments.

The Government's investigation shows that one probable cause for the high profitability of Anthem's retrospective chart review program is Anthem's choice to disregard whether Verscend's medical record review results demonstrate that certain provider-submitted diagnosis codes already sent to CMS were invalid. Anthem's own guidance makes clear that the

---

[5] The investigation shows that, besides the provider-submitted claims data and the retrospective chart reviews, Anthem also collected diagnosis codes for risk-adjustment purposes using other means, such as "house calls" to beneficiaries' homes. The Government is not seeking testimony relating to these other sources of diagnosis data because they do not appear to involve the same medical records that are the subject of chart review by Verscend. *See* 8/10/2018 USAO Letter at 2 (Yu Decl. Ex. 10).

fact a provider-submitted code does not appear in the chart review results for the same visit can signal that the diagnosis does not meet the CMS risk-adjustment guidelines — for example, the diagnosis may be "documented using only numerical ICD-9 codes" without any text, or it may not have "result[ed] from a face-to-face visit." *See* Medicare Advantage Risk Adjustment Programs at 7 (Yu Decl. Ex. 3). The provider-submitted diagnosis also may be invalid for more prosaic reasons like reversing two digits in a diagnosis code or mistaking two patients with similar names, *see* Deposition Transcript of Phillip Delugosz at 74:24–76:2 (Yu Decl. Ex. 6).

Yet, as Anthem has admitted in response to this investigation, it does not make efforts to determine which of the provider-submitted codes that Anthem reported to CMS are not found through Verscend's medical records review. *See* Yu Decl. ¶ 6. In other words, the record suggests that, instead of using the chart review process to identify both additional codes to submit and corrections to be made, Anthem executed its chart review program *solely* to generate additional diagnosis codes to report so that it could receive more payments from CMS.

  **D. To Expedite the Investigation, CID 18-46 Seeks Testimony That Provides an Overview of the Policies and Processes at Anthem Relating to the Validity of Its Risk-Adjustment Data Submissions to CMS**

The parts of CID 18-46 at issue here demand testimony from Anthem concerning three topics: (*i*) internal auditing procedures for determining whether or not the provider-submitted or chart review-generated diagnosis codes for four sample beneficiaries – as reported by Anthem to CMS – are documented in the medical records; (*ii*) Anthem's policies, procedures, and training for ensuring that the provider-submitted and chart review-generated diagnosis codes are valid and supported by medical records; and (*iii*) the personnel that Anthem relied on to ensure compliance with these policies, procedures, and training. *See* Addendum to CID 18-46 at 3 (Yu Decl. Ex. 1); 8/1/2018 USAO Letter to Anthem at 2 (offering two limitations on the relevant CID topics) (Yu Decl. Ex. 8).

The Government seeks such testimony because it is directly relevant to the questions of whether Anthem disregarded its obligation to ensure that the risk-adjustment diagnosis data it reported to CMS was valid and supported by medical records and, if so, whether it acted with the requisite *scienter*. *See* Yu Decl. at ¶ 6. At this juncture, moreover, obtaining testimony from one or more Anthem corporate representatives about the relevant policies and processes – as compared to simply focusing on written policies – expedites this investigation by enabling the Government to more quickly and efficiently (*i*) clarify the interactions between Anthem's official policies and training materials and its actual processes and procedures, (*ii*) determine the underlying strategic choices made by Anthem's management, and (*iii*) identify leads and sources of information that bear on Anthem's conduct and *scienter*. *See id*.

The need for expedition, as noted above, results from Anthem's decision in March 2018 to stop extending its FCA tolling agreement after it learned that the Government intends to pursue FCA claims if this investigation reveals a pattern of conduct similar to what occurred in the *United Healthcare* litigation. *See id*. ¶ 5. Anthem's decision means that any significant delay in this investigation may curtail the Government's remedies under the FCA by potentially rendering certain claims untimely under the applicable statute of limitations, *see* 31 U.S.C. § 3731(b). To avoid such delay, the Government is seeking to obtain an overview of the policies and processes pertaining to Anthem's assessment of the validity of the diagnosis codes submitted by service providers or generated through the chart review program as promptly as possible, including, as relevant here, through the testimony sought by CID 18-46.[6] *See* Yu Decl. at ¶ 6.

---

[6] As its effort to expedite, the Government has deposed two corporate representatives from Anthem concerning Topics 1, 2, 3(i) and 3(ii) in CID 18-46 and obtained certain interrogatory responses and records from Anthem. Further, on August 9, the Government provided Anthem with five targeted electronic searches. Anthem, however, has not agreed to implement those electronic searches or committed to a date by which to produce the responsive documents.

## ARGUMENT

### POINT I

### THE STANDARD FOR CID ENFORCEMENT UNDER THE FCA

In enacting the statutory authority of CIDs under the FCA, Congress intended to "enable the Government to determine whether enough evidence exist[s] to warrant the expense of filing [a civil] suit, as well as to prevent the potential Defendant from being dragged into court unnecessarily." H.R. Rep. 660, 99th Cong., 2d Sess. 26 (1986). A CID under the FCA is a type of administrative subpoena. *See United States v. Markwood*, 48 F.3d 969, 976 (6th Cir. 1995) ("legislative history [shows] that Congress viewed the false claims CID" as "a type of administrative subpoena" analogous to the CID under federal antitrust laws). Thus, the standard for summary enforcement of an administrative subpoena applies to a petition to enforce under the FCA, *id*. at 975–76 (affirming district court's application of the standard for enforcing administrative subpoenas to a petition to enforce a CID under 31 U.S.C. § 3733(j)); and a court's "role in [reviewing] the enforcement of an administrative subpoena is a limited one." *Id*. at 976; *accord United States v. AGS Solutions Corp.*, 2018 WL 1418023, at *4 (S.D. Cal. Mar. 22, 2018) (the "scope of judicial review" of FCA CID "is quite narrow"), *report and recommendation adopted at* 2018 WL 3471405; *see also FTC v. Texaco*, 555 F.2d 862, 871-72 (D.C. Cir. 1977*), cert. denied*, 431 U.S. 974 (1977) (the scope of judicial review on a request for enforcement of an administrative subpoena such as a CID is "strictly limited").

Enforcement of an FCA CID is proper as long as the district court finds that (*i*) the inquiry is within the authority of the issuing agency, (*ii*) the information sought is reasonably relevant to that inquiry, and (*iii*) the requests are not too indefinite or unduly burdensome. *See generally United States v. Powell*, 379 U.S. 48, 57-58 (1964) (enunciating the standard of review for enforcing an administrative subpoena issued by IRS); *see also United States v. Witmer*, 835 F.

Supp. 208, 220 (M.D. Pa. 1993) (adopting the *Powell* standard for enforcing a CID under the FCA). Thus, once the Government has advanced "a plausible argument in support of its assertion of jurisdiction, a district court must enforce the subpoena if the information sought there is not plainly incompetent or irrelevant to any lawful purpose of the [Government]." *EEOC v. Kloster Cruise Ltd.*, 939 F.2d 920, 922 (11th Cir. 1991); *see also N.L.R.B. v. Am. Med. Response, Inc.,* 438 F.3d 188, 193 (2d Cir. 2006) ("In enforcing administrative subpoenas, courts broadly interpret relevancy").

## POINT II

### THE GOVERNMENT IS ENTITLED TO ENFORCEMENT OF CID 18-46

**A. The Government's Investigation Is Within the Jurisdiction Provided by the FCA**

The FCA provides civil remedies to the Government against "all fraudulent attempts to cause the Government to pay out sums of money." *United States v. Neifert-White, Co.*, 390 U.S. 228, 233 (1968). Here, the Government seeks to ascertain whether or not Anthem has knowingly obtained and/or retained risk-adjustment payments from CMS based on invalid provider-submitted diagnosis codes and also contravened the annual attestations it submitted to CMS. *See* Yu Decl. at ¶ 2.

As the Ninth Circuit recognized in *Swoben*, Medicare part C plan sponsors like Anthem can be liable under the FCA if they carry out "retrospective [chart] reviews by not causing the previously submitted diagnosis codes that were unsupported by the retrospective reviews to be corrected and withdrawn from the Government" so that "the retrospective [chart] reviews would only increase, and not decrease, the number of diagnoses … in order to increase capitated payments paid by [CMS]." 848 F.3d at 1173-74. Therefore, the Government is entitled to (and intends to) assert claims under the FCA against Anthem if the investigation shows that Anthem disregarded the obligation to ensure the validity of the provider-submitted

diagnosis codes it reported to CMS and acted with the requisite *scienter*. *See* Yu Decl. at ¶ 5.

### B. The Testimony Sought by CID 18-46 Regarding Anthem's Policies and Processes Is Relevant to the Matters under Investigation

Information demanded by a CID must be reasonably relevant to an agency's investigation. *See United States v. Oncology Services Corp.*, 60 F.3d 1015, 1020 (3d Cir. 1995). Relevance is broadly interpreted in the context of enforcing administrative subpoenas. *Texaco, Inc.*, 555 F.2d at 872. So long as the information requested "touches a matter under investigation, an administrative subpoena will survive a challenge that the material is not relevant." *Sandsend Fin. Consultants, Ltd. v. Fed. Home Loan Bank Board*, 878 F.2d 875, 882 (5th Cir. 1989).

Here, the focus of this investigation is about whether Anthem engaged in the type of conduct that is at issue in the Government's pending FCA risk-adjustment litigation against United Healthcare and, if so, whether it acted with the requisite *scienter*. More specifically, as Anthem knows, the Government seeks to determine whether Anthem knowingly disregarded its obligation to vet the validity of providers-submitted diagnosis codes "that were unsupported by the retrospective chart reviews" and correct or withdraw the invalid codes. *See* 8/1/2018 USAO Letter at 1 (Yu Decl. Ex. 8).

To the extent Anthem asserts that the Government's FCA investigation should be focused *solely* on Anthem's chart review program, *see* 8/8/2018 Bowman Letter at 1 (Yu Decl. Ex. 9), and *not* on whether or how it vetted the validity of provider-submitted diagnosis codes, this contention cannot be squared with *Swoben*. *See* 848 F.3d at 1173-74 (recognizing that FCA liability arises based on a Part C plan sponsor's failure to "correct[] and withdraw[]" the provider-submitted diagnosis codes "that were unsupported by the retrospective reviews"). Indeed, Anthem's admission – that it did not implement procedures to determine which provider-submitted diagnosis codes were *not* found through Verscend's medical records review, *see* Yu Decl. ¶ 6 – makes it even more critical for the Government to know whether Anthem took

appropriate steps to vet the validity of these codes. Specifically, it bear directly on Anthem's conduct and *scienter* as a Part C plan sponsor to know the answers to questions such as:

    i. whether, independent of Verscend's chart review, Anthem implemented any procedure or assigned any personnel to review any of the medical records associated with provider-submitted diagnosis codes to determine whether those codes are supported by the medical records under CMS guidelines, *see* Medicare Advantage Risk Adjustment Programs at 7 (Yu Decl. Ex. 3);

    ii. whether Anthem implemented policies and procedures to "detect[] and correct" non-compliance with CMS requirements and "fraud, waste and abuse" in relation to its risk-adjustment data submissions, *see* 42 C.F.R. § 422.503(b)(vi);

    iii. whether Anthem trained its employees involved in the risk-adjustment data submission process on their "obligation to under take 'due diligence' to ensure the accuracy, completeness, and truthfulness of the risk-adjustment data they submit to CMS," *see Swoben*, 848 F.3d at 1166-67;

    iv. what procedures and processes, if any, Anthem established to ensure that its annual attestations to CMS regarding the "accuracy, completeness, and truthfulness" of its risk-adjustment data submissions were made based on "good faith efforts," *see id.* at 1167;

    v. whether Anthem implemented any procedure or assigned any personnel to "monitor[]" and "audit" the validity of diagnosis codes it received from service providers, *see* 42 C.F.R. § 422.503(b)(vi)(F);

    vi. whether, as part of its training, Anthem made its employees aware of the fact that CMS audits had identified errors in the risk-adjustment diagnosis data submitted by Anthem, *see Swoben*, 848 F.3d at 1175 (recognizing United Healthcare's response to CMS audit findings is relevant to its *scienter*);

    vii. how Anthem chose the policies and processes it implemented for ensuring the validity of provider-submitted diagnosis codes and who made the choices; and

    viii. whether Anthem *in fact* complied with its own policies and training in relation to the validity of provider-submitted diagnosis codes.

Topics 3(iii), 4, and 5 in CID 18-46 seek testimony that would answer these and other similar

questions that bear directly on Anthem's FCA liability. *See* Addendum to CID 18-46 at 3 (Yu Decl. Ex. 1); *see generally Swoben*, 848 F.3d 1173-79.

Such testimony thus is relevant to the matters under investigation. Furthermore, at this juncture, obtaining this testimony – especially an understanding of Anthem's internal processes and decision-makings – will allow the Government to identify key leads and sources of relevant information, which would in turn enable the Government to complete this investigation expeditiously and then make a determination regarding whether to pursue FCA claims against Anthem on a timely basis. *See* Yu Decl. ¶¶ 5-6

### C. It Is Not Unreasonable or Unduly Burdensome to Require Anthem to Provide Testimony Regarding Topics Directly Related to Its Annual Attestations

Anthem, as the recipient of a CID, bears the burden to show that compliance with CID 18-46 would somehow be unreasonable or unduly burdensome. *See United States ex rel. Time Warner, Inc.*, 1997 WL 118413, at *6 (Jan. 22, 1997 D.D.C.) (enforcing CID); *see generally Texaco, Inc.*, 555 F.2d at 882. Where the investigation "is authorized by law and the materials sought are relevant to the inquiry, that burden is not easily met." *SEC v. Brigadoon Scotch Distr. Co.*, 480 F.2d 1047, 1056 (2d Cir. 1973).

Here, Anthem has not articulated – and cannot articulate – any sufficient justification for refusing to provide testimony on the three topics at issue under CID 18-46. To the extent Anthem alleges that these three topics are too vague or ambiguous, that claim simply cannot be squared with either the annual attestations certifying Anthem's good faith belief that the risk-adjustment data it reported to CMS, including diagnosis codes, is "accurate, complete and truthful," *see* Attestation of Risk Adjustment Data dated June 8, 2016 (Yu Decl. Ex. 2), or the detailed descriptions concerning what it means for medical record documentation to be "acceptable for risk adjustment per CMS" in Anthem's own guidance, *see* Medicare Advantage Risk Adjustment Programs at 7 (Yu Decl. Ex. 3).

Nor can Anthem claim – based on nebulous references to complex business procedures, see 8/8/2018 Bowman Letter at 1 (Yu Decl. Ex. 9) – that it would be unduly burdensome to provide testimony concerning its policies, procedures, training, and personnel. It is well-established that a company's "policies and practices" are appropriate subjects of testimony by a corporate representative. *See generally Buycks-Roberson v. Citibank*, 162 F.R.D. 338, 343 (N.D. Ill. 1995); *accord 20th Century Fox Film v. Marvel Enterprises*, 01 Civ. 3016 (AGS)(HB), 2002 WL 1835439, at *2-3 (S.D.N.Y. Aug. 8, 2002).

Further, in light of the annual attestations Anthem made certifying its good-faith "belief" in the accuracy of the diagnosis codes it submitted to CMS, *see* Yu Decl. Ex. 2, and considering the hundreds of millions of dollars in additional risk-adjustment payments that Anthem received from CMS, *see supra* at 4-5, there is no basis for Anthem to complain that it would be "unduly burdensome" to describe its policies and processes to the Government. *See generally Witmer*, 835 F. Supp. at 220 (rejecting claims of undue burden "in the context of [an] investigation involving an alleged $47 million fraud"). This is especially so after the Government has voluntarily accepted two significant limitations on the scope of testimony it is seeking under CID 18-46. *See* 8/1/2018 USAO Letter at 2 (Yu Decl. Ex. 8) (proposing to limit the number of sample beneficiaries relevant to Topic 3(iii) to four and to limit the scope of all three topics to the validity of diagnosis codes submitted by service providers or generated by Verscend as part of Anthem's retrospective chart review program).

### D. Anthem Is Not Entitled to Evade Potential FCA Liability by Imposing Unreasonable Limits on CID Testimony and Delaying the Investigation

The Government is seeking to obtain an overview of Anthem's policies and processes through CID 18-46 and to avoid having to gather such information piecemeal through a slew of document requests, interrogatories, and individual depositions. *See* Yu Decl. ¶¶ 5-6. This is not simply a matter of convenience; instead, due to Anthem's decision in March 2018 to stop tolling FCA claims, any delay associated with piecemeal discovery can be unfairly prejudicial insofar as

14

such delay may curtail the Government's remedies under the statute of limitations on FCA claims, *see* 31 U.S.C. § 3731(b). *See supra* at 7-8.

The Government takes no issue with Anthem's right to decide whether to toll FCA claims. However, having decided to stop tolling such claims, Anthem is not *then* entitled to evade potential liability by imposing unreasonable limits on CID testimony and thereby unfairly impede the Government's ability to complete its investigation and, if appropriate, bring suit. Here, Anthem's refusal to provide relevant testimony in response to a valid CID undermines the Government's "legitimate right to [ascertain whether] corporate behavior is consistent with the law []." *Morton Salt Co.*, 338 U.S. at 652. The Court should accordingly order Anthem to provide testimony on the three topics at issue – subject to limitations the Government voluntarily accepted – and put a stop to Anthem's interference with the "important governmental interest in the expeditious investigation of possible unlawful activity." *Markwood,* 48 F.3d at 979.

## CONCLUSION

For the reasons above, the Government respectfully requests that the Court grant its petition and order Anthem to produce corporate representative(s), <u>by October 2, 2018</u>, to give testimony regarding the three topics at issue in relation to *both* the provider-submitted diagnosis codes *and* the diagnosis codes generated by Anthem's retrospective chart review program.

Dated:  New York, New York
        August 20, 2018

                                            Respectfully submitted,

                                            GEOFFREY S. BERMAN
                                            United States Attorney

By:  */s/ Li Yu*
      LI YU
      PETER ARONOFF
      Assistant United States Attorneys
      Tel.: (212) 637-2734/2697
      E-mail: li.yu@usdoj.gov
              peter.aronoff@usdoj.gov