# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Petitioner,<br><br>  v.<br><br>ANTHEM, INC.,<br><br>    Respondent. | Misc. Proceeding: 1:18-mc-00379-GBD |

## RESPONDENT ANTHEM, INC.'S MEMORANDUM OF LAW IN OPPOSITION TO THE GOVERNMENT'S PETITION TO ENFORCE CIVIL INVESTIGATIVE DEMAND 18-46

Dated: September 4, 2018

DAVID M. DEATON (*Pro Hac Vice*)
JAMES A. BOWMAN (*Pro Hac Vice*)
O'MELVENY & MYERS LLP
400 South Hope Street 16th Floor
Los Angeles, California  90071
(213) 430-6000
(213) 430-6407 (fax)
ddeaton@omm.com
jbowman@omm.com

VALERIE COHEN
O'MELVENY & MYERS LLP
Times Square Tower, 7 Times Square
New York, New York 10036
(212) 326-2000
(212) 326-2061 (fax)
vcohen@omm.com

JOHN D. MARTIN
NELSON MULLINS LLP
1320 Main Street
Columbia, South Carolina 29201
(803) 255-9241
(803) 256-7500 (fax)
john.martin@nelsonmullins.com

*Attorneys for Respondent Anthem, Inc.*

# TABLE OF CONTENTS

**Page**

RELEVANT BACKGROUND ............................................................................ 4

    A.      Anthem's Medicare Advantage Program and Chart Reviews .............................. 4

          1.      Medicare Advantage Plans' Obligations Under the Attestation Requirement ............................................................................ 5

          2.      The Role of Chart Reviews in Medicare Advantage ............................... 7

          3.      The *Swoben* Decision and Subsequent Dismissal of Government Claims Under the *Swoben*-Theory of Liability ........................................... 8

    B.      Anthem Has Cooperated Fully With the Government's Investigation Into Its Chart Review Practices ................................................................................ 9

          1.      The Stated Focus of the Government's Investigation ............................... 9

          2.      Anthem Has Cooperated With the Government's Investigation .............. 9

          3.      The Government Refused to Meet and Confer Regarding the Scope of Topics 3, 4, and 5 of CID No. 18-46 ................................................. 10

ARGUMENT ................................................................................................... 13

    A.      The Court Should Deny the Government's Petition to Compel Anthem to Provide Testimony Regarding Vague and Burdensome Deposition Topics that Lack any Connection to the Stated Focus of the Government's Investigation ........................................................................................................ 13

          1.      The Petition Should Be Denied Because the Government Refused to Meet and Confer Regarding the Scope of the Depositions It Seeks to Compel ................................................................................ 15

          2.      The Government's Petition Should Be Denied Because It Fails to Provide the Notice Required by Rule 30(b)(6) ...................................... 18

          3.      The Government's Petition Should Be Denied Because the Government's Proposed Topics Are Not Proportional to the Needs of the Investigation ................................................................................ 21

CONCLUSION ................................................................................................ 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bowers v. Mortg. Elec. Registration Sys., Inc.*,
2011 WL 6013092 (D. Kan. Dec. 2, 2011)................................................................. 18, 19, 21

*Citigroup Mortg. Loan Trust 2007-ACM3 v. Citigroup Global Mkts. Realty Corp.*,
2016 U.S. Dist. LEXIS 185289 (S.D.N.Y. Dec. 7, 2016) ................................................ 21, 25

*Civil Investigative Demand 15-349*,
2016 WL 4275853 (W.D. Va. Aug. 12, 2016) ........................................................................ 14

*Excess Ins. Co. v. Rochdale Ins. Co.*,
2007 WL 2900217 (S.D.N.Y. Oct. 4, 2007) ............................................................................ 16

*FTC v. Texaco, Inc.*,
555 F.2d 862 (D.C. Cir. 1977) ................................................................................................ 14

*Mika v. Four Seasons Hotels*,
1999 WL 47319 (S.D.N.Y. Feb. 1, 1999) ................................................................................ 16

*Murphy v. Kmart Corp.*,
255 F.R.D. 497 (D.S.D. 2009) ................................................................................................ 21

*Prescient Partners, L.P. v. Fieldcrest Cannon, Inc.*,
1998 WL 67672 (S.D.N.Y. Feb. 18, 1998)......................................................................... 16, 17

*RNR Enters., Inc. v. SEC*,
122 F.3d 96 (2d Cir. 1997)...................................................................................................... 14

*SEC v. Arthur Young & Co.*,
584 F.2d 1018 (D.C. Cir. 1978) .............................................................................................. 14

*Shim-Larkin v. City of New York*,
2018 WL 3187327 (S.D.N.Y. June 28, 2018) ........................................................................ 16

*Tri-Star Pictures, Inc. v. Unger*,
171 F.R.D. 94 (S.D.N.Y. 1997) .............................................................................................. 18

*United States ex rel. Poehling v. United Health Grp., Inc.*,
2018 U.S. Dist. LEXIS 37418 (C.D. Cal. Feb. 12, 2018).................................................... 1, 9

*United States ex rel. Poehling v. Unitedhealth Grp, Inc.*,
CV 16-08697 MFW (C.D. Cal. Dec. 8, 2017)..................................................................... 9, 23

*United States ex rel. Swoben v. Scan Health Plan*,
2017 U.S. Dist. LEXIS 174308 (C.D. Cal. Oct. 5, 2017)..................................................... 1, 8

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*United States ex rel. Swoben v. Scan Health Plan*,
  CV 09-5013 JFW (JEMx) (C.D. Cal. July 14, 2017) ............................................ 8

*United States ex rel. Swoben v. United HealthCare Ins. Co.*,
  848 F.3d 1161 (9th Cir. 2016) ........................................ 8, 9, 22, 23

*United States v. Markwood*,
  48 F.3d 969 (6th Cir. 1995) ............................................ 13

*United States v. Morton Salt*,
  338 U.S. 632 (1950) ...................................................... 14

*United States v. Powell*,
  379 U.S. 48 (1964) ........................................................ 14

*United States v. Witmer*,
  835 F. Supp. 208 (M.D. Pa. 1993) ................................. 13

*Winfield v. City of New York*,
  2018 WL 840085 (S.D.N.Y. Feb. 12, 2018) ................... 18, 20, 25

**Statutes**

31 U.S.C. § 3733(a)(1) ........................................................ 13

31 U.S.C. § 3733(j)(1) ........................................................ 13

31 U.S.C. § 3733(j)(6) ................................................... 14, 15

42 U.S.C. § 1395w-21(a) ...................................................... 4

42 U.S.C. § 1395w-23(a) ...................................................... 4

42 U.S.C. § 1395w-23(a)(1)(C)(i) ......................................... 4

**Other Authorities**

CMS, *2017 Medicare Fee-for Service Supplemental Improper Payment Data*,
  Tables N1, N3 & N4 ("*2017 IP Data*"), https://www.cms.gov/Research-
  Statistics-Data-and-Systems/Monitoring-Programs/Medicare-FFS-
  Compliance-Programs/CERT/Downloads/2017-Medicare-FFS-Improper-
  Payment.pdf ................................................................... 6

CMS, *Announcement of Calendar Year (CY) 2010 Medicare Advantage
  Capitation Rates and Medicare Advantage and Part D Payment Policies*
  (April 6, 2009) ............................................................... 5

**TABLE OF AUTHORITIES**
**(continued)**

Page(s)

CMS, Final Encounter Data Diagnosis Filtering Logic (Dec. 22, 2015).........................................7

CMS, Medicare Managed Care Manual, (Jan. 11, 2013) ...............................................................6

Gregory C. Pope, et al., *Risk Adjustment of Medicare Capitation Payments Using the CMS-HCC Model*, Health Care Fin. Rev., Summer 2004 ...................................6

**Rules**

Fed. R. Civ. P. 26(b)(1).................................................................................................................15

Fed. R. Civ. P. 30(b)(6).................................................................................................................15

Fed. R. Civ. P. 37(a)(1).................................................................................................................15

**Regulations**

42 C.F.R. § 422.504(l) .....................................................................................................................5

65 Fed. Reg. 40,170, 40,268 (June 28, 2000) .................................................................................5

HHS-OIG's Compliance Program Guidance for Medicare+Choice Organizations Offering Coordinated Care Plans, 64 Fed. Reg. 61, 893, 61,900 (Nov. 15, 1999) ...................................................................................................................................6

Medicare Program, Contract Year 2015 Policy and Technical Changes to the Medicare Advantage and The Medicare Prescription Drug Benefit Programs, 79 Fed. Reg. 1918, 2053 (Jan. 10, 2014) ...................................................................................7

Medicare Program; Contract Year 2015 Policy and Technical Changes to the Medicare Advantage and the Medicare Prescription Drug Benefit Program, 79 Fed. Reg. 29,844, 29,956 (May 23, 2014) ..............................................................................7

## PRELIMINARY STATEMENT

The government asks the Court to compel Anthem, Inc. ("Anthem") to provide testimony that has no connection to the stated focus of the government's investigation. While this testimony is at most peripheral to the government's inquiry, it poses a massive and unreasonable burden on Anthem. Anthem has tried without success at least ***ten times*** over the past six months to meet and confer with government counsel regarding fairly obvious problems with the scope of the requests; instead, the government has prematurely sought Court intervention without having conducted a single in-person or telephonic meet and confer regarding the topics at issue.

The Department of Justice has taken the position that where a Medicare Advantage plan, like Anthem, reviews a member's medical chart to identify additional diagnoses that had not previously been reported, the plan must also undertake the entirely separate and painstaking process of analyzing whether other diagnosis codes (previously reported to the government) were also valid. Two district courts, however, have dismissed government claims based on this theory, primarily due to its inability to allege that the Centers for Medicare & Medicaid Services ("CMS") would have adjusted the payment to the plan if CMS had known it was not making that comparison. *See United States ex rel. Swoben v. Scan Health Plan*, 2017 U.S. Dist. LEXIS 174308, at *19-20 (C.D. Cal. Oct. 5, 2017); *United States ex rel. Poehling v. United Health Grp., Inc.*, 2018 U.S. Dist. LEXIS 37418, at *33 (C.D. Cal. Feb. 12, 2018). The government has nevertheless stated that it is investigating Anthem under this same flawed theory.

Contrary to the government's suggestion in the petition, Anthem has cooperated extensively with this investigation. Since December 2016, Anthem has responded to nearly 50 interrogatories, presented witnesses for multiple days of depositions, produced relevant policy documents, and given the government more than 100 gigabytes of requested data. Where

Anthem believed particular investigative requests posed an undue burden, it immediately raised those concerns with government counsel and sought to work cooperatively to resolve them.

For the deposition topics at issue here, however, the government has refused to even hear Anthem's concerns regarding the breadth of these topics.  Topics 3(iii), 4, and 5 from CID No. 18-46 demand testimony regarding all of the processes, procedures, and training Anthem followed from 2010 through 2018 to "ensure" that diagnosis codes submitted to CMS were "valid" and "supported by the medical record."  While this request may at first blush appear straightforward, these topics present substantial practical problems.  Anthem submits more than 10 million diagnosis codes each year, including codes from thousands of different healthcare providers, vendors, and other third parties — each with their own procedures that can affect the validity of the data.  The disputed topics require testimony from one end of Anthem's code-submission process (for example, the submission of a claim to Anthem from a provider, which is processed through one of Anthem's many claims-processing systems), to the other (where Anthem submits risk adjustment data through two different CMS systems), with multiple steps in between (for example, where Anthem analyzes data through a risk adjustment "filter").  The topics also call for processes designed to audit or supplement data after submission to CMS. None of these processes have any bearing on the stated focus of the government's investigation: the Anthem chart review program.  The breadth of a request for Anthem's processes would be substantial if there were just a single, standardized set of processes in place, but the topics call for a broader set of information from all Anthem regions, various claims-processing and other systems, and changes in processes that occurred over the nine-year period demanded in the CID.

In a March 30, 2018 letter, Anthem described these concerns in great detail, in the hope of engaging the government in a dialogue to cure the defects in the CID.  After the government

deferred discussion on these topics, Anthem suggested alternative testimony that it believed was tailored to the subject matter of the government's investigation, offering to provide a witness regarding the processes used to ensure the accuracy of data from its chart review program. The government rejected Anthem's attempts to resolve this dispute but refused to explain the connection between its proposed topics and the chart review practices it was supposedly investigating. Anthem remains baffled why the government has refused nearly a dozen requests for a simple call or meeting to discuss these specific deposition topics.

The government's petition should be denied for three reasons. **First**, government counsel refused to meet and confer on these disputed topics, a prerequisite to seeking relief from this Court. **Second**, the requests fail to provide the level of particularity needed to prepare binding corporate testimony. **Third**, the government demands testimony from Anthem (*i.e.*, testimony regarding the accuracy of provider-submitted codes) that bears no coherent connection to the focus of its investigation (*i.e.,* whether Anthem uses its chart review process to find potentially unsupported codes). And the government's refusal to meet and confer has left the record undeveloped regarding the significant burdens posed by the overbroad testimony it seeks.

The government's claimed need for "expedited" depositions on these topics, and its demand that the depositions occur just two weeks after the hearing on its petition, is equally without merit. Far from displaying any urgency over these requests, the record is clear that the government has ignored Anthem's efforts to resolve any dispute over these topics for several months.

For the reasons set forth below, the Court should deny the petition. In the alternative, the Court should deny the petition without prejudice and order government counsel to meet and confer in a good faith effort to resolve the scope of these disputed deposition topics.

## RELEVANT BACKGROUND

### A.     Anthem's Medicare Advantage Program and Chart Reviews

Medicare Part C, also known as Medicare Advantage, allows beneficiaries to enroll in plans administered by private insurance companies, like Anthem, instead of receiving their care through Medicare Parts A and B ("traditional Medicare").  *See* 42 U.S.C. § 1395w-21(a).  Under traditional Medicare, healthcare providers bill CMS directly for the services provided to Medicare beneficiaries on a "fee-for-service" basis.  Under Medicare Advantage, however, CMS enters into contracts with health plans like Anthem where CMS pays plans each month based on the anticipated costs of providing care to their population of members.  Anthem then typically pays the healthcare providers with whom it contracts to deliver healthcare to its members.  42 U.S.C. § 1395w-23(a).

As part of its determination of how much to pay a Medicare Advantage plan, CMS predicts the annual cost of care associated with different health conditions by establishing coefficients that are intended to correlate to the estimated cost of care that CMS would expect to incur for the same care in traditional Medicare.  As a general matter, these coefficients are based on the historical costs in traditional Medicare for treating beneficiaries who were diagnosed by providers with those same conditions.  Indeed, Congress requires that CMS's aggregate prospective payments to Medicare Advantage plans include an "actuarial equivalen[t]" amount to what CMS expects it would cost to serve the plan's members if they were enrolled in the traditional Medicare program.  42 U.S.C. § 1395w-23(a)(1)(C)(i).

Typically, after a Medicare Advantage member is seen by his or her healthcare provider, the provider submits data, including diagnosis codes, to Anthem.  Anthem processes the diagnosis code data (ensuring that a number of different elements of the data are acceptable) and then submits data including diagnosis codes for its members to CMS on a periodic basis.

Anthem may submit to CMS for each member, depending on his or her overall health and number of visits each year, hundreds or even thousands of diagnosis codes in a single year. Declaration of Kristina Cournoyer in Opp. to the Government's Petition to Enforce Civil Investigative Demand 18-46 ("Cournoyer Decl.") ¶ 4. Anthem has thousands of different contracted healthcare providers in its network, almost a million members, and each year it submits more than twelve million diagnosis codes from providers to CMS. *Id.*

Once it receives this data, CMS calculates a so-called "risk score" for each Anthem member based on the received diagnosis codes and other relevant data. It then uses this risk score to determine the payment to Anthem.

### 1. Medicare Advantage Plans' Obligations Under the Attestation Requirement

CMS regulations require Medicare Advantage plans to "certif[y] (based on best knowledge, information, and belief) the [1] accuracy, [2] completeness, and [3] truthfulness of relevant data," including diagnostic data, that plans submit to CMS. 42 C.F.R. § 422.504(l) (the "Attestation Requirement"). Importantly, however, CMS has **not** dictated the steps that Medicare Advantage plans must undertake to meet the three elements of the Attestation Requirement. With respect to the accuracy requirement, for instance, HHS-OIG has instructed that plans are responsible for "having taken reasonable steps to assure the accuracy"[1] of the data

---

[1] Despite the government's implications to the contrary, accuracy in the context of the certification requirement does **not** mean that Medicare Advantage plans must submit perfect data. *See* 65 Fed. Reg. 40,170, 40,268 (June 28, 2000) ("[Medicare Advantage] organizations cannot reasonably be expected to know that every piece of data is correct, nor is that the standard that HCFA, the OIG, and DoJ believe is reasonable to enforce."). Rather, in CMS's own words, Medicare Advantage plans "are coding 'accurately' when they are coding in a manner similar to fee-for-service coding used on the beneficiaries to whom [Medicare Advantage] plan enrollees are being compared." CMS, *Announcement of Calendar Year (CY) 2010 Medicare Advantage Capitation Rates and Medicare Advantage and Part D Payment Policies* (April 6, 2009). And, as CMS has also recognized, diagnosis coding in traditional Medicare has high rates of error. *See* Declaration of James A. Bowman in Opp. to the Government's Petition to Enforce Civil Investigative Demand 18-46 ("Bowman Decl.") ¶ 34 Ex. U (Model Calibration Factor) ("In

they submit, though "[t]he exact methods used by the [Medicare Advantage plan] to accomplish this can be determined by the organization."  HHS-OIG's Compliance Program Guidance for Medicare+Choice Organizations Offering Coordinated Care Plans, 64 Fed. Reg. 61, 893, 61,900 (Nov. 15, 1999); *see also* CMS, Medicare Managed Care Manual, Chapter 21 § 30 (Jan. 11, 2013) (compliance programs "should be tailored to each sponsor's unique organization, operations and circumstances").

With respect to completeness, CMS has offered even less guidance, except to instruct Medicare Advantage plans to take steps to ensure that all of the medical conditions documented in their members' medical charts are submitted to CMS.  *See, e.g.,* CMS, Medicare Managed Care Manual, Chapter 7, § 40 (requiring plans to "[s]ubmit all required diagnosis codes for each beneficiary").  This obligation is particularly challenging where physicians accustomed to traditional Medicare may not pay attention to diagnosis codes on their claim forms because diagnosis codes typically do not drive payment for outpatient services in traditional Medicare. *See, e.g.*, Gregory C. Pope, et al., *Risk Adjustment of Medicare Capitation Payments Using the CMS-HCC Model*, Health Care Fin. Rev., Summer 2004, at 129 ("Concern about the quality of diagnostic reporting is the greatest in physician offices, where diagnoses have not heretofore affected payment, and recording of diagnoses is less rigorously practiced than in hospitals").

---

[Original] Medicare, some portion of diagnoses on [Original Medicare] claims are not documented in medical records."); *Id.* Ex. V (Three RADV Policy Issues) ("[O]utside of the hospital setting, physicians are not consistent in following coding guidelines and there are issues with the quality of medical record documentation that are not unique to MA providers.").  For example, CMS reported that diagnosis codes included on claim forms in traditional Medicare had error rates ranging from 4% to 50% in 2017, depending on the specific condition being diagnosed.  *See* CMS, *2017 Medicare Fee-for Service Supplemental Improper Payment Data*, Tables N1, N3 & N4 ("*2017 IP Data*"), https://www.cms.gov/Research-Statistics-Data-and-Systems/Monitoring-Programs/Medicare-FFS-Compliance-Programs/CERT/Downloads/2017-Medicare-FFS-Improper-Payment.pdf.

### 2.    The Role of Chart Reviews in Medicare Advantage

Chart reviews—which, as discussed in more detail *infra*, are the stated focus of the government's investigation—are one process that Medicare Advantage plans may employ to meet the Attestation Requirement's completeness element.   Chart reviews involve the collection and review of a member's medical records to determine if there are additional diagnosis codes supported by the medical records that ***should*** have been submitted to CMS, but for whatever reason the healthcare provider failed to report.   While the government attempts in the petition to paint chart reviews as something nefarious, that is simply not true.   CMS is not only aware of this practice, it has established specific procedures to enable Medicare Advantage plans to submit additional diagnosis codes identified from such reviews.   *See, e.g.,* CMS, Final Encounter Data Diagnosis Filtering Logic (Dec. 22, 2015) ("In addition to submitting records for encounters, plan sponsors are also allowed to submit encounter data records that reflect their reviews of medical records (called 'chart review' records).")

CMS has not issued regulatory guidance regarding how Medicare Advantage plans should conduct their chart reviews.   In January 2014, CMS proposed a rule that would have required Medicare Advantage plans to confirm through their chart reviews that all codes that had previously been submitted to CMS had adequate support in the medical records.   *See* Medicare Program, Contract Year 2015 Policy and Technical Changes to the Medicare Advantage and The Medicare Prescription Drug Benefit Programs, 79 Fed. Reg. 1918, 2053 (Jan. 10, 2014).   But CMS ultimately decided ***not*** to adopt this proposed rule requiring so-called "two way" chart reviews.   *See* Medicare Program; Contract Year 2015 Policy and Technical Changes to the Medicare Advantage and the Medicare Prescription Drug Benefit Program, 79 Fed. Reg. 29,844, 29,956 (May 23, 2014).

3.     **The *Swoben* Decision and Subsequent Dismissal of Government Claims Under the *Swoben*-Theory of Liability**

Despite CMS's decision not to impose a rule requiring Medicare Advantage plans that conduct chart reviews to identify potentially unsupported diagnosis codes, the U.S. Court of Appeals for the Ninth Circuit, in *United States ex rel. Swoben v. United HealthCare Ins. Co.,* issued a decision holding that a Medicare Advantage plan's certification could be "false" if the plan designed a chart review program "deliberately to avoid identifying erroneously submitted diagnosis codes."  848 F.3d 1161, 1175 (9th Cir. 2016).  By its plain language, the *Swoben* decision only pertains to False Claims Act ("FCA") liability that may arise when a Medicare Advantage plan conducts chart reviews; nothing in the *Swoben* decision addressed or even suggested that plans have a duty to verify the accuracy of all diagnosis codes they submit to CMS.

On remand in *Swoben*, the government filed a complaint-in-intervention against another Medicare Advantage plan, United HealthCare ("United").  The district court dismissed the government's claims, however, because the government failed (among other things) to allege that CMS would have refused to make risk adjustment payments to United if it had known that the plan was conducting so-called "one way" chart reviews.  *United States ex rel. Swoben v. Scan Health Plan,* 2017 U.S. Dist. LEXIS 174308, at *19-20 (C.D. Cal. Oct. 5, 2017).  United has repeatedly asserted that CMS was fully aware that it and other health plans were conducting chart reviews and not using those reviews to identify potentially unsupported codes and nevertheless continued to pay United and these other plans despite that knowledge.  *See, e.g.,* CV 09-5013 JFW (JEMx) (C.D. Cal. July 14, 2017) (ECF No. 316 at 20).  For that reason, United argued in *Swoben* that the government could not truthfully allege that its chart review practices were material to CMS' payment decision.  *Id*.  In a related FCA case, *United States ex rel.*

*Poehling v. Unitedhealth Grp, Inc.*, United moved to dismiss the government's claims based on the *Swoben* theory, again arguing that the government had failed to allege that its chart review practices were material to CMS' payment decision.  CV 16-08697 MFW (C.D. Cal. Dec. 8, 2017) (ECF No. 182 at 18).  The district court in *Poehling* dismissed these claims, concluding that "as in *Swoben*, the Government has failed to allege that CMS would have refused to make risk adjustment payments if it had known the Attestations were false."  2018 U.S. Dist. LEXIS 37418, at *33 (C.D. Cal. Feb. 12, 2018) (citation omitted).

**B.      Anthem Has Cooperated Fully With the Government's Investigation Into Its Chart Review Practices**

        **1.      The Stated Focus of the Government's Investigation**

Since Anthem first received a CID from the government in December 2016, the government has made clear that the focus of its investigation is on Anthem's chart review practices and the *Swoben* theory of liability, *i.e.*, whether Anthem reviewed its members' medical charts to identify diagnoses codes that had not been previously reported to CMS, and if so, whether it also undertook the entirely separate process of analyzing previously reported diagnosis codes that may not have been properly documented by the healthcare provider in the member's medical chart.  Bowman Decl. ¶ 2.  Over the past year and a half, and as recently as four weeks ago, the government confirmed that its investigation is focused on "whether Anthem executed its 'retrospective [chart] reviews … deliberately to avoid identifying erroneously submitted diagnosis codes that might otherwise have been identified with reasonable diligence." *Id*. ¶ 28 Ex. P (SDNY August 1, 2018 letter at 1) (citing *Swoben*).

        **2.      Anthem Has Cooperated With the Government's Investigation**

Over the past eighteen months, Anthem has demonstrated its desire to comply with the government's investigation.  Since December 2016, the government has issued eleven separate

CIDs to Anthem in connection with the investigation into its chart review program.  In responding to these CIDs, Anthem has produced thousands of documents, responded to nearly 50 separate interrogatories, presented corporate designee witnesses for multiple days of testimony, and provided more than 100 gigabytes of data.  *Id*. ¶ 2.  Where the government's requests have created practical (and potentially unintended) consequences that would have made it unduly burdensome to respond, Anthem has met and conferred with the government to explain these issues and develop reasonable solutions.  *Id*. ¶ 4.

3.   **The Government Refused to Meet and Confer Regarding the Scope of Topics 3(iii), 4, and 5 of CID No. 18-46**

On March 22, 2018, Anthem received CID No. 18-46, which demanded deposition testimony on five broad topics (including multiple subtopics) covering a broad array of business practices over a nine-year period.  *Id*. ¶ 11 Exs. A (CID No. 18-46) and B (SDNY March 22, 2018 letter).  The breadth of these topics caused Anthem great concern because, as written, they could not possibly be addressed within the three-week response period demanded by the government.  As just one example, Topic 2 demanded (without limitation) testimony regarding every diagnosis code that was submitted for twelve Anthem members over a nine-year period; the topic did not specify what information Anthem was supposed to provide regarding these diagnosis codes or members, leaving to the imagination what information Anthem must produce. Nor did it apparently account for the fact that there were more than 8,600 separate diagnosis code / date of service combinations submitted for these twelve members during the relevant time period.  *Id*. ¶ 13.

Concerned that the government was either intentionally requiring Anthem to provide testimony in a timeframe that was not possible or was unaware of the broad scope of the requests, Anthem promptly met and conferred with government counsel to explain the problems

with these requests.  *Id.* ¶ 14.  Rather than simply serve objections to these overbroad topics, as was its right, Anthem instead provided the government with a detailed, twelve-page explanation of the practical problems with the government's CID and suggested alternatives that could potentially address those problems.  *Id*. ¶ 13 Ex. C (Anthem March 30, 2018 letter).

During a meet and confer discussion regarding the first several topics in the CID (Topics 1, 2, 3(i), and 3(ii)), the government suggested that it could narrow the topics if Anthem provided additional information (not called for in the CID) regarding its chart review process.  *Id*. ¶ 15. Anthem voluntarily provided the requested information and sought again to meet and confer regarding the deposition topics.  *Id*. ¶¶ 16-18.  The government expressly deferred discussion regarding the topics at issue in the petition, Topics 3(iii), 4, and 5, in favor of resolving disputes regarding Topics 1, 2, 3(i), and 3(ii) and moving forward with those depositions.  *Id*. ¶ 21. Anthem and the government were able to agree on the scope for these other topics, and Anthem provided witnesses to testify for two days regarding its risk adjustment revenue calculations, diagnosis code submission process, and any comparisons it may have made (before *Swoben*) between its chart review results and other diagnosis codes submitted to CMS.  *Id*. ¶ 21-22.

Once those depositions were completed, the government demanded that Anthem provide witnesses for the remaining topics (Topics 3(iii), 4, and 5) with no offer to meet and confer.  This surprised Anthem, because it had repeatedly sought to engage with the government regarding these topics and had understood that the parties would ultimately address the problems with their scope once the other depositions were completed.  *Id*. ¶ 21.  Anthem again described the problems with the scope of these topics and invited the government to meet and confer about them.  *Id*. ¶ 22-23.  After the government ignored Anthem's requests to discuss these topics, Anthem served objections and responses to the topics and offered to provide testimony on

narrowed topics that it believed addressed the stated focus of the government's investigation (*i.e.,* the chart review program). *Id*. ¶ 24 Ex. J (Anthem June 29, 2018 Objections and Responses).  At the same time, Anthem reiterated its interest in meeting and conferring to address any concerns the government may have about the topics that Anthem had proposed. *Id*. ¶ 24 Ex. K (Anthem June 29, 2018 E-mail).

But the government ignored this request, as well as five later requests, to meet and confer.  Instead, the government insisted that the scope of the topics did not need to be resolved before the depositions and that Anthem could instead simply raise objections to the scope during the depositions themselves. *Id*. ¶ 27 Ex. N (SDNY July 25, 2018 e-mail).  As Anthem explained, however, this proposal was unworkable because Anthem needed to know the scope of the topics in advance of the depositions so that it could ensure that the witnesses were adequately prepared to give responsive testimony. *Id*. ¶ 27 Ex. O (Anthem July 25, 2018 e-mail).  In fact, Anthem made clear that it needed this information to simply identify appropriate corporate designees. *Id.*

After Anthem said it would not produce witnesses for the remaining topics until the parties had met and conferred regarding their scope, the government sent a letter on August 1, 2018 that partially accepted the topic that Anthem had proposed (*i.e.*, the processes Anthem follows to ensure the accuracy of results from its chart review program), but insisted that Anthem also provide testimony regarding measures that Anthem employed to ensure the accuracy of its provider-submitted claims. *Id*. ¶ 28 Ex. P (SDNY August 1, 2018 letter at 2).  Even though this testimony has no connection to Anthem's chart review program, the government was either unwilling or unable to explain how it related to the subject matter of its investigation. *Id.* Further, the government refused to address other necessary limits for the topics, such as confirming that Anthem was not required to provide testimony regarding the varied practices of

thousands of contracted providers, IPAs, and vendors, or addressing the broad nine-year time period in the CID.  *Id.*  Anthem again offered to meet and confer with the government, but instead the government decided to proceed with this petition.  *Id*. ¶¶ 29, 32 Ex. Q (Anthem August 8, 2018 letter at 5) and Ex. T (Anthem August 15, 2018 letter at 1-2).

## ARGUMENT

**A.**   **The Court Should Deny the Government's Petition to Compel Anthem to Provide Testimony Regarding Vague and Burdensome Deposition Topics that Lack any Connection to the Stated Focus of the Government's Investigation**

When the Attorney General or his designee "has reason to believe that any person may be in possession, custody, or control of any documentary material or information relevant to a false claims law investigation," he or she may issue a CID requiring the person or company to, among other things, "give oral testimony concerning such documentary material or information."  31 U.S.C. § 3733(a)(1).  The Attorney General or his designee may also petition the district court for an order enforcing the CID.  31 U.S.C. § 3733(j)(1).

Courts have held that a CID authorized by the FCA is "a type of administrative subpoena," *United States v. Markwood*, 48 F.3d 969, 976 (6th Cir. 1995), and have applied the same standard of review to petitions for enforcement that apply to motions to enforce administrative subpoenas.  *See id.* (analogizing 31 U.S.C. § 3733(a)(1) to the statute authorizing CIDs in federal antitrust investigations and applying administrative subpoena standards to determine enforceability); *United States v. Witmer*, 835 F. Supp. 208, 213 (M.D. Pa. 1993) (applying administrative subpoena review standards to CID in FCA investigation).

In the Second Circuit, in order to "win judicial enforcement of an administrative subpoena," the government "must show (1) that the investigation will be conducted pursuant to a legitimate purpose, (2) that the inquiry may be relevant to that purpose, (3) that the information sought is not already within the [government's] possession, and (4) that the administrative steps

required … have been followed." *RNR Enters., Inc. v. SEC*, 122 F.3d 96, 96–97 (2d Cir. 1997)

(quoting *United States v. Powell*, 379 U.S. 48, 57-58 (1964)).  Even if the government makes this

preliminary showing, enforcement is inappropriate if the respondent demonstrates that the CID is

"unreasonabl[e] or was issued in bad faith or for an 'improper purpose,' or that compliance

would be '***unnecessarily*** burdensome.'"  *Id.* at 97 (emphasis in original) (internal citations

omitted); *see also SEC v. Arthur Young & Co.*, 584 F.2d 1018, 1024 (D.C. Cir. 1978)

(administrative subpoena must be "sufficiently limited in scope, relevant in purpose, and specific

in directive so that compliance will not be unreasonably burdensome").  Without appropriate

limits, "a governmental investigation into corporate matters may be of such a sweeping nature

and so unrelated to the matter properly under inquiry as to exceed the [agency's] investigatory

power."  *Arthur Young* at 1023 (quoting *United States v. Morton Salt*, 338 U.S. 632, 652 (1950)).

Although "[s]ome burden on subpoenaed parties is to be expected and is necessary in

furtherance of the agency's legitimate inquiry and the public interest," *Civil Investigative

Demand 15-349*, 2016 WL 4275853, at *7 (W.D. Va. Aug. 12, 2016) (quoting *FTC v. Texaco,

Inc.*, 555 F.2d 862, 882 (D.C. Cir. 1977)), if the demand is unduly burdensome, "the district

court is authorized to impose reasonable conditions and restrictions with respect to the

production of the subpoenaed material." *FTC*, 555 F.2d at 881; *see also Civil Investigative

Demand 15-349*, 2016 WL 4275853, at *8 (taking petition to enforce CID under advisement and

directing parties to "meet and confer regarding production of categories of relevant and non-

duplicative information").

Petitions for summary enforcement of CIDs are governed by the Federal Rules of Civil

Procedure "to the extent such rules are not inconsistent with the provisions" of the authorizing

statute.  31 U.S.C. § 3733(j)(6).  Three such rules are relevant to the CID topics in dispute and

the government's petition.  ***First***, before seeking court intervention regarding the deposition topics, the government must establish that it has first met and conferred regarding the subject matter of the petition.  *See* Fed. R. Civ. P. 37(a)(1) (a motion to compel must "include a certification that the movant has in good faith conferred or attempted to confer with the person or party failing to make disclosure or discovery in an effort to obtain it without court action").  ***Second***, deposition notices directed to an organization must "describe with reasonable particularity the matters for examination."  *See* Fed. R. Civ. P. 30(b)(6).  ***Third***, a party may only "obtain discovery … that is relevant to any party's claim or defense and proportional to the needs of the case."  *See* Fed. R. Civ. P. 26(b)(1).

The government's petition does not comply with these three Rules of Civil Procedure.[2]

### 1.  The Petition Should Be Denied Because the Government Refused to Meet and Confer Regarding the Scope of the Depositions It Seeks to Compel

The government filed this petition to force Anthem to provide testimony regarding overbroad topics, without ever meeting and conferring with Anthem on the specific topics at issue.  Its failure to meet and confer before seeking this Court's intervention mandates that its petition be denied.

A party moving to compel must include a certification that the movant has in good faith attempted to meet and confer regarding the discovery at issue.  Fed. R. Civ. P. 37(a)(1).  In this judicial district, it is not enough to simply exchange letters, as the government has done here.

---

[2] While the government may contend that these rules are intended for litigation and should not be applied in an investigative context, such a claim would be meritless.  The statute addressing petitions to enforce CIDs mandates that the Federal Rules of Civil Procedure "***shall apply*** to any petition" under the regulation, unless inconsistent with other provisions in the regulation.  31 U.S.C. § 3733(j)(6) (emphasis added).  These rules, which govern identical discovery methods in federal civil matters, are entirely consistent with the provisions of Section 3733.  For its part, the government has repeatedly relied on the Federal Rules of Civil Procedure, including Rule 30(b)(6), in its correspondence to Anthem describing the company's obligations to respond to the CID.  Bowman Decl. ¶ 11 Ex. B (SDNY March 22, 2018 letter at 1).

Instead, the moving party must certify that it has met and conferred with the opposing side **by phone** or **in person** before seeking relief.  "[I]t has long been known that the meet-and-confer requirement means to 'meet, in person or by telephone.'" *Shim-Larkin v. City of New York*, 2018 WL 3187327, at *8 (S.D.N.Y. June 28, 2018) (internal citation omitted); *see also Mika v. Four Seasons Hotels*, 1999 WL 47319, at *1 (S.D.N.Y. Feb. 1, 1999) (Even "[t]he exchange of letters between counsel stating positions 'for the record' shall not be deemed compliance with the [meet-and-confer] requirement."); *Excess Ins. Co. v. Rochdale Ins. Co.*, 2007 WL 2900217, at *1 (S.D.N.Y. Oct. 4, 2007) ("Mere correspondence, absent exigent circumstances…does not satisfy the [meet-and-confer requirement.").  Failing to meet and confer mandates denial of a motion to compel absent circumstances that made such discussions futile.  *See Prescient Partners, L.P. v. Fieldcrest Cannon, Inc.*, 1998 WL 67672, at *2–3 (S.D.N.Y. Feb. 18, 1998).

The government's petition includes no certification that it met and conferred regarding the deposition topics at issue.  This is no accident; the government cannot make this certification because it affirmatively avoided any in person or telephonic meet and confer with Anthem before filing this motion.  Bowman Decl. ¶¶ 11-32.  Faced with concerns regarding the scope of these topics, Anthem did exactly what it was supposed to do—it immediately expressed its concerns in detail, it offered potential solutions to these concerns, and it repeatedly sought to meet and confer with the government regarding these concerns.  *Id*.  The government did the opposite—it demanded that Anthem simply accept the topics as written, it suggested that no meet and confer was necessary because Anthem could just object during the depositions themselves, and it ignored no fewer than ten written requests to meet and confer regarding the topics.  *Id*.

The government may contend, as it has in correspondence with Anthem, that it has in fact engaged in meet and confer discussions regarding this CID and that further meet and confer

-16-

discussions would have been futile.  *Id*. ¶ 31 Ex. S (SDNY August 10, 2018 letter at 1).  While the government met and conferred with Anthem regarding certain deposition topics not at issue here (Topics 1, 2, 3(i), and 3(ii)), the government ***specifically deferred*** any discussion of the topics at issue here (Topics 3(iii), 4, and 5), asking to address them at a later date.  *Id*. ¶ 21.  Rather than resume those discussions, however, the government instead demanded through correspondence that Anthem comply with the topics as written.  The parties have thus ***never*** had a telephonic or in-person meet and confer regarding the topics at issue in the petition.  *Id*. ¶ 32 Ex. T (Anthem August 15, 2018 letter at 1).

Nor would any meet and confer have been futile.  To the contrary, when the government declined Anthem's repeated requests for a meet and confer, Anthem offered testimony that it believed addressed the focus of the government's investigation and made clear that it was open to discussing other subjects that would provide the government with the information that it reasonably needs for its investigation.  *Id*. ¶ 24 Exs. J (Anthem June 29, 2018 Objections and Responses) and K (Anthem June 29, 2018 e-mail).  Anthem also explained that it did not understand the connection between the testimony the government was demanding and the stated focus of its investigation and suggested that a meet and confer, where the government could explain the reason why it was seeking this information, would help identify potential areas of compromise and crystalize any remaining issues before resorting to judicial intervention.

Thus, while the government's petition paints a false picture that Anthem has been uncooperative with its inquiry, the record demonstrates just the opposite.  Anthem has done everything possible to engage constructively with the government, but the government prematurely filed this petition.  The government's failure to meet and confer precludes the relief it seeks from the Court.  *See Prescient Partners*, 1998 WL 67672, at *2–3 (denying motion to

compel due to failure to meet and confer and rejecting conclusory statements in plaintiff

counsel's affidavit attesting to "good faith" negotiations); *Tri-Star Pictures, Inc. v. Unger*, 171

F.R.D. 94, 100 (S.D.N.Y. 1997) (denying motion to compel due to a failure to meet and confer).

### 2. The Government's Petition Should Be Denied Because It Fails to Provide the Notice Required by Rule 30(b)(6)

Federal Rule of Civil Procedure 30(b)(6) requires that deposition notices directed to an

organization "describe with *reasonable particularity* the matters for examination" so that the

organization can prepare a witness to testify "fully and non-evasively about the subjects listed in

the notice." *Winfield v. City of New York*, 2018 WL 840085, at *4 (S.D.N.Y. Feb. 12, 2018)

(internal quotations omitted).  Under Rule 30(b)(6), the requesting party "must take care to

designate, with painstaking specificity, the particular subject areas that are intended to be

questioned, and that are relevant to the issues in dispute." *Bowers v. Mortg. Elec. Registration

Sys., Inc.*, 2011 WL 6013092, at *6 (D. Kan. Dec. 2, 2011).  Because the government's topics

here lack reasonable particularity, and indeed provide almost no guidance about the specific

business practices that must be addressed in the deposition, the petition should be denied.

The topics at issue in the petition are so vague and broad that they provide no meaningful

boundaries or notice of what corporate testimony the government requires.  Specifically, the

government demands testimony regarding the various "policies, procedures, training, and

personnel that Anthem relied on to ensure the validity and supportability of diagnosis data it

submitted to CMS based on the provider-submitted claims and Anthem's retrospective chart

review program." Bowman Decl. ¶ 28 Ex. P (SDNY August 1, 2018 letter at 2).  Anthem is a

large company, with dozens of departments, more than 50,000 employees across the country, and

just under one million members.  Cournoyer Decl. ¶ 3.  To respond to this topic, Anthem must

arguably investigate and prepare testimony from nearly ***all*** aspects of its risk adjustment process,

from the time the member visits with their healthcare provider, to the submission of that claim to Anthem through a clearinghouse and processing through Anthem's claims adjudication systems, the use of Anthem's risk adjustment filter to screen the data that is submitted to CMS, and the processes at Anthem that supplement and audit the data after it has been submitted to CMS.  *Id.* ¶ 6–13.  Indeed, in its effort to illustrate how the proposed topics are relevant to its investigation, the government demonstrates the unbounded nature of the topics by enumerating, for the first time in its petition, a non-exhaustive list of ***eight*** separate processes that it believes could (potentially) be included within the scope of the topic.  Memorandum of Law in Support of the Government's Petition to Enforce Compliance with CID 18-46 ("Pet.") at 11-13.  Each of these processes include business functions from different departments at Anthem and may require the testimony of one or more witnesses to fully and accurately describe each of those processes.

Nor is it evident from the plain language of the proposed topic what the government believes should be included.  Instead, Anthem must investigate all those practices and make a subjective determination about which practices have an impact on the "validity" and "supportability" of diagnosis data submitted to CMS.  This difficult task is only compounded by the government's failure to even define the terms "valid" and "supported by the medical record".  There are different industry standards and definitions for these terms.  *See Bowers*, 2011 WL 6013092, at *7 (finding that topics using vague and undefined terms "transactions" and "Terms and Conditions" failed to provide required notice).

While the government offered to limit this testimony to four specific Anthem members, this supposed concession provides no meaningful limitation or focus at all.  Bowman Decl. ¶ 29 Ex. Q (Anthem August 8, 2018 letter at 3).  The practices that affect or ensure the validity of provider-submitted claims are the same regardless of whether the testimony is based on four

members or four thousand -- the relevant consideration is not the number of members but the number and variety of business practices that must be addressed and the time period at issue.

The uncertainty over what business practices fall within the scope of the intended testimony is compounded by the government's refusal to have any discussion or substantive exchange with Anthem about its rationale for these topics or what it intends to be within scope. As a result, Anthem is left to guess whether the government requires testimony regarding various business functions and practices, or whether it does not believe certain practices are responsive to the Rule 30(b)(6) notice.  For example, the CID purports to require testimony from Anthem, including any "agent," "representative," "affiliate," or "person acting or purporting to act on behalf of Anthem."  Anthem has repeatedly raised with the government the fact that it has thousands of contracted providers, each of which may have their own practices to address the validity of the codes they provide to Anthem for submission to CMS.  Bowman Decl. ¶ 29 Ex. Q (Anthem August 8, 2018 letter at 3).  If the government intends for Anthem to construe the CID according to its plain language, then the practices of each of these providers are responsive to the deposition notice.  The government's refusal to engage in a single meet and confer discussion with Anthem regarding its objections has left unresolved whether it truly expects Anthem to undertake the impossible exercise of investigating each provider's practices in order to give responsive deposition testimony.

This vague scope is at odds with the Federal Rules, which obligate a party seeking a deposition to describe the matters for examination with "reasonable particularity," and this "requires the topics listed to be specific as to subject area and to have discernible boundaries." *Winfield*, 2018 WL 840085, at *5.  These rules are in place because it is unfair to expect a party to "interpret" the line of inquiry considering that the party "could face sanctions for failing to

adequately produce and prepare its deponents." *Murphy v. Kmart Corp.*, 255 F.R.D. 497, 506 (D.S.D. 2009).  Indeed, "an overbroad Rule 30(b)(6) notice subjects the noticed party to an impossible task" because the "responding party is unable to identify the outer limits of the areas of inquiry noticed, and designating a representative in compliance with the deposition notice becomes impossible." *Bowers*, 2011 WL 6013092, at *4 (finding that a topic calling for "Quality Assurance and Data Integrity including the reporting systems including reconciliation between members" did not meet the reasonable particularity requirement because it failed to "define what Plaintiffs are referring to as 'Quality Assurance and Data Integrity.'") *Id*. at 6.

### 3.      The Government's Petition Should Be Denied Because the Government's Proposed Topics Are Not Proportional to the Needs of the Investigation

The government's demand for testimony regarding all processes at Anthem that may ensure the validity of its data is not tailored to the chart review practices that the government has asserted are the focus of its investigation.  While this testimony offers little benefit to the government's investigation of Anthem's potential liability under *Swoben*, it poses a substantial burden on Anthem given the unfocused nature of the proposed topics and the steps Anthem must take to respond.  Accordingly, it would not be proportional under Rule 26 to require Anthem to provide this testimony.  *See Citigroup Mortg. Loan Trust 2007-ACM3 v. Citigroup Global Mkts. Realty Corp.*, 2016 U.S. Dist. LEXIS 185289, at *12 (S.D.N.Y. Dec. 7, 2016) (purpose of 2015 amendments to Rule 26 was to "encourage judges to be more aggressive in identifying and discouraging discovery overuse by emphasizing the need to analyze proportionality before ordering production of relevant information") (internal citation and quotations omitted).

Throughout its investigation of Anthem, the government has consistently asserted that its investigation is focused on Anthem's chart review process, and specifically, whether Anthem

compares the results of its chart reviews against other diagnosis codes in compliance with

*Swoben*.  As recently as four weeks ago, the government confirmed this focus:

> [W]e have been clear with you that this investigation is focused on … whether
> Anthem executed its "retrospective [chart] reviews … deliberately to avoid
> identifying erroneously submitted diagnosis codes that might otherwise have been
> identified with reasonable diligence." *U.S. ex rel. Swoben v. United Healthcare
> Ins. Co.*, 848 F.3d 1161, 1167 (9th Cir. 2016).  Specifically, we seek to determine
> whether Anthem conducted its "retrospective [chart] reviews by not causing the
> previously submitted diagnosis codes that were unsupported by the retrospective
> reviews to be corrected and withdrawn from the Government" so that "the
> retrospective [chart] reviews would only increase, and not decrease, the number
> of diagnoses … in order to increase capitated payments paid by the Government."

Bowman Decl. ¶ 28 Ex. P (SDNY August 1, 2018 Letter at 1).  Anthem has already provided

extensive discovery regarding its chart review practices and has offered further testimony

regarding the steps taken to ensure the accuracy of codes submitted from chart reviews.  *Id.*

¶¶ 22-24.  But the government wants to go further, seeking testimony that has no connection to

Anthem's chart review program on the theory that it is somehow relevant to *Swoben*.  Pet. at 11.[3]

But despite multiple requests from Anthem, the government has never explained how the

requested testimony relates to potential liability under *Swoben*.  The government's assertion that

*Swoben* somehow supports its demand for testimony about Anthem's steps to verify provider-

submitted claims cannot be squared with the clear language of the *Swoben* decision.  The Ninth

Circuit expressly stated that "***this is not a case about whether Medicare Advantage

organizations have to take affirmative steps to verify risk adjustment data***," 848 F.3d at 1179

(emphasis added), and was careful to limit its holding to steps Medicare Advantage plans must

take to identify potentially unsupported codes ***when they conduct retrospective reviews***.  *Id.*

---

[3] The government's repeated citation of Anthem's Coding Manual in asserting that Anthem had a
duty under *Swoben* to verify each diagnosis code it submitted to CMS is misleading.  (*See, e.g.*,
Pet. at 11).  The Coding Manual provides general guidance regarding medical record
documentation requirements for ICD-9 and ICD-10 coding; it does nothing to suggest that
Anthem had a duty—under *Swoben* or otherwise—to validate provider-submitted data.

And despite the government's claim that evidence regarding general steps Anthem took to validate codes is somehow relevant to a *Swoben* theory of liability, the government has taken exactly the ***opposite*** position in opposing discovery requests from United Healthcare.  In the petition, the government has framed its inquiry as an investigation into whether "Anthem engaged in the type of conduct that is at issue in the Government's pending FCA risk-adjustment litigation against United Healthcare."  Pet. at 14.  Yet in the government's recent briefing in the United Healthcare case, the government ***expressly denied*** that its claims had any connection to the "general duty to verify diagnosis codes."  *See* CV 16-08697 MFW (C.D. Cal. Dec. 8, 2017) (ECF No. 261-1 at 5) ("The United States has not alleged that United had a general duty to verify diagnosis codes, but rather that where, as here, it undertook reviews of those codes, it had a duty to delete any unsupported codes it found.").  The contradictory positions taken by the government undermine its claim in the petition that this testimony is necessary and relevant to its investigation of Anthem.

In its petition, the government also attempts to link the demanded testimony to the *Swoben* theory by claiming that the testimony "***may*** shed light on Anthem's *scienter*" Pet. at 2 (emphasis added), or otherwise could potentially identify "leads and sources of information that bear on Anthem's conduct and *scienter*."  *Id.* at 8.  To the extent the government intends to investigate Anthem's state of mind in conducting a chart review program and the reasons various features of that program have been implemented, there are far more direct ways to obtain that information than the burdensome testimony the government seeks here.  Indeed, the government has already propounded a separate CID containing twelve interrogatories and eleven document requests, as well as noticed seven individual depositions from Anthem employees, that it claims are targeted at investigating Anthem's purported *scienter*.  Bowman Decl. ¶ 30 Ex. R (SDNY

August 9, 2018 letter at 1-2.)  These newest CIDs include the government's demand for email communications regarding the purpose of Anthem's chart review program, the reason for starting the program, and discussions for continuing the program.  *Id.*

While the demanded testimony offers little benefit to the government's investigation, it poses a substantial burden to Anthem, particularly where Anthem has already provided a substantial amount of data, testimony, and documents responsive to the government's requests.

As described above, *see* argument section A-2 *supra*, there are numerous Anthem business functions that may affect the validity of provider-submitted claims and it is unclear (because the government has refused to meet and confer regarding these topics) which of these practices or business functions are intended to be addressed in the deposition sought by the government.  Investigating each potential business practice, and collecting information about that practice, is a labor-intensive exercise that takes significant internal and external resources.  It also takes substantial time to complete these labor-intensive tasks.  Given the government's refusal to discuss the relevant time period, and the broad nine-year period specified in the CID, Anthem must also undertake the historical exercise of determining what processes existed as far back as 2010 for each function, including contacting employees with historical knowledge of those practices (if any can be located), searching for documents that describe those practices, and resolving any discrepancies in advance of the testimony.  Obtaining this information will necessarily require assistance and involvement from a number of different Anthem business teams, all of whom have their own daily obligations to operate Anthem's business.

This effort must be repeated for each function or practice for which Anthem will provide testimony, not to mention any investigation that must also be done for programs carried out by contracted providers or provider groups, if in fact the government is intent on requiring

testimony from all of Anthem's agents, representatives, and affiliates as defined in the CID.  The fact that Anthem attests to the overall accuracy of Anthem's risk adjustment data on an annual basis does not ease this burden because, as discussed in footnote 1 *supra*, the attestation does not require that Anthem verify each individual piece of data is correct.

While the government's refusal to provide clarity regarding the scope of what is included in its proposed topics has left the record undeveloped regarding the specific burdens that Anthem would face in providing informed and responsive testimony, it is clear based on the broad time period, the business processes that are likely involved, and the inclusion of Anthem's agents and contractors with the scope, that providing responsive testimony is a massive undertaking that far outweighs the limited benefit to the government's inquiry.  Cournoyer Decl. ¶ 6–13.  Imposing such a burden, particularly where Anthem has already provided extensive discovery and is willing to provide testimony regarding the accuracy of its chart review program, is not proportional to the marginal benefit of such discovery to the government's investigation.  *See Citigroup Mortg. Loan Trust*, 2016 U.S. Dist. LEXIS 185289, at *64 (denying demand for Rule 30(b)(6) deposition testimony covering potentially 1,000 loans as not proportional under Rule 26 because it would impose a substantial preparation burden on the respondent with only a marginal benefit); *Winfield*, 2018 WL 840085, at *3 (concluding that relevance from policy-related questions were not proportional to the needs of the case given other discovery that had been conducted, including the production of relevant policies and deposition testimony).

<u>**CONCLUSION**</u>

For the reasons stated above, Anthem respectfully requests that the Court deny the government's petition to enforce CID No. 18-46.  In the alternative, Anthem asks the Court to deny the petition with leave to refile and order government counsel to meet and confer regarding the scope of the topics at issue in the petition.

Dated:  September 4, 2018                    O'MELVENY & MYERS LLP


By: _____

DAVID M. DEATON (*Pro Hac Vice*)
JAMES A. BOWMAN (*Pro Hac Vice*)
O'MELVENY & MYERS LLP
400 South Hope Street 16th Floor
Los Angeles, California  90071
(213) 430-6000
(213) 430-6407 (fax)
ddeaton@omm.com
jbowman@omm.com

VALERIE COHEN
O'MELVENY & MYERS LLP
Times Square Tower, 7 Times Square
New York, New York 10036
(212) 326-2000
(212) 326-2061 (fax)
vcohen@omm.com

JOHN D. MARTIN
NELSON MULLINS LLP
1320 Main Street
Columbia, South Carolina 29201
(803) 255-9241
(803) 256-7500 (fax)
john.martin@nelsonmullins.com

*Attorneys for Respondent Anthem, Inc.*