UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------X

UNITED STATES OF AMERICA,                    :

                    Petitioner,     :

           -against-                    :      **REPORT AND RECOMMENDATION**

ANTHEM, INC.,                                :      18-MC-379 (GBD) (KNF)

                Respondent.   :

------------------------------------------------------X

KEVIN NATHANIEL FOX
UNITED STATES MAGISTRATE JUDGE

TO THE HONORABLE GEORGE B. DANIELS, UNITED STATES DISTRICT JUDGE

## INTRODUCTION

Before the Court is a petition by the United States of America (the "Government"), made

pursuant to the False Claims Act (the "FCA"), 31 U.S.C. § 3733(j), "for an Order directing

respondent Anthem, Inc. ('Anthem') to comply with Civil Investigative Demand 18-46 ('CID

18-46'), which was issued to Anthem by the Government on March 22, 2018." The Government

asserts that "[t]hrough the Centers for Medicare and Medicaid Services ('CMS')," it provides

funding for the "Medicare Advantage" program, commonly known as "Medicare Part C" and

"Anthem is a sponsor of Medicare Part C plans." The Government alleges that CID 18-46 seeks

deposition testimony concerning "Topics 3(iii), 4, and 5 in CID 18-46" from Anthem "to

investigate whether Anthem violated the FCA in connection with its 'submission of risk

adjustment claims to [] CMS under Parts C and D of the Medicare Program.'" The Government

asserts that it "has reason to believe that the testimony responsive to Topics 3(iii), 4 and 5 in CID

18-46 is relevant to the subject matter of this investigation." The Government's CID 18-46

indicates:

1

This Civil Investigation Demand is issued pursuant to the False Claims Act, 31 U.S.C. § 3733, in the course of a False Claims Act investigation, to determine whether there is or has been a violation of 31 U.S.C. § 3729 *et seq*. The False Claims Act investigation concerns Anthem, Inc.'s submission of risk adjustment claims to the Centers for Medicare and Medicaid Services ("CMS") under Part C and D of the Medicare Program.

Topics 3(iii), 4 and 5 contained in CID 18-46 seek testimony concerning the following:

3.  For each of the Sample Beneficiaries, the processes and procedures You used to determine which diagnosis codes to include in each of the CMS Dx codes submissions for that beneficiary. This includes, without limitation . . . (iii) any internal auditing procedures (including quality assurance and quality control procedures) You used to determine whether any diagnosis codes in the CMS Dx codes submissions for that beneficiary were not documented in the beneficiary's medical records.

4.  The policies, procedures, and training You expected Your employees or contractors to follow in ensuring that the diagnosis codes included in Your CMS Dx codes submissions were valid and supported by medical records.

5.  The employees, business teams, or contractors You relied on to ensure compliance with the policies, procedures, and training to be described in response to Topic 4.

The Government asserts that Anthem "refused to provide such testimony pursuant to CID 18-46." The Government seeks an order directing Anthem to: (1) "show cause as to why it should not be compelled to comply with CID 180-46"; and (2) "produce a corporate representative by October 2, 2018, to testify about Topics 3(iii), 4, and 5 in CID 18-46 and subject to the two limitations that the Government voluntarily accepted on August 1, 2018."

On August 20, 2018, the following was ordered: (i) Anthem to show cause, on September 20, 2018, why an order should not be issued pursuant to 31 U.S.C. § 3733(j) directing Anthem "to produce a witness to provide testimony on the three topics in CID 18-46 on or before October 2, 2018"; (ii) Anthem to answer the petition; and (iii) the Government to file any reply. Docket Entry No. 2. Anthem filed its opposition to the petition and the Government filed its reply. The September 20, 2018 hearing was cancelled and the Court advised the parties that it would be

rescheduled. See Docket Entry No. 21. Thereafter, the Court determined that, based on the fact

that the petition was briefed fully, no need existed to conduct a hearing. See Docket Entry No.

25.

## GOVERNMENT'S CONTENTIONS

The Government asserts that it "is entitled to enforcement of CID 18-46" because its

investigation is within the FCA's jurisdiction and "the testimony sought by CID18-46 regarding

Anthem's policies and procedures is relevant to the matters under investigation." The

Government contends that

> the focus of this investigation is about whether Anthem engaged in the type of
> conduct that is at issue in the Government's pending FCA risk-adjustment litigation
> against United Healthcare and, if so, whether it acted within the requisite *scienter*.
> More specifically, as Anthem knows, the Government seeks to determine whether
> Anthem knowingly disregarded its obligation to vet the validity of providers-
> submitted diagnosis codes "that were unsupported by the retrospective chart
> reviews" and correct or withdraw the invalid codes. *See* 8/1/2018 USAO Letter at
> 1 (Yu Decl. Ex. 8). To the extent Anthem asserts that the Government's FCA
> investigation should be focused *solely* on Anthem's chart review program, *see*
> 8/8/2018 Bowman Letter at 1 (Yu Decl. Ex. 9), and *not* on whether or how it vetted
> the validity of provider-submitted diagnosis codes, this contention cannot be
> squared with [U.S. v. Swoben, 848 F.3d 1161,] 1173-74 [(9th Cir. 2016)]
> (recognizing that FCA liability arises based on a Part C plan sponsor's failure to
> "correct[] and withdraw[]" the provider-submitted diagnosis codes "that were
> unsupported by the retrospective reviews). Indeed, Anthem's admission – that it
> did not implement procedures to determine which provider-submitted diagnosis
> codes were *not* found through Verscend' s medical records review, *see* Yu Decl. ¶
> 6 – makes it even more critical for the Government to know whether Anthem took
> appropriate steps to vet the validity of these codes.

The Government contends that the following are examples of questions for Anthem:

i. Whether, independent of Verscend's chart review, Anthem implemented
any procedure or assigned any personnel to review any of the medical
records associated with provider-submitted diagnosis codes to determine
whether those codes are supported by the medical records under CMS
guidelines, *see* Medicare Advantage Risk Adjustment Programs at 7 (Yu
decl. Ex. 3);

ii. Whether Anthem implemented policies and procedures to "detect[] and
correct" non-compliance with CMS requirements and "fraud, waste and

abuse" in relation to its risk-adjustment data submissions, *see* 42 U.S.C. § 422.503(b)(vi);

iii.    Whether Anthem trained its employees involved in the risk-adjustment data submission process on their "obligation to under take [sic] 'due diligence' to ensure the accuracy, completeness, and truthfulness of the risk-adjustment data they submit to CMS," *see Swoben*, 848 F.3d at 1166-67;

iv.    What procedures and processes, if any, Anthem established to ensure that its annual attestations to CMS regarding the "accuracy, completeness, and truthfulness" of its risk-adjustment data submissions were made on "good faith efforts," *see id.* at 1167;

v.    Whether Anthem implemented any procedure or assigned any personnel to "monitor[]" and "audit" the validity of diagnosis codes it received from service providers, *see* 42 C.F.R. § 422.503(b)(vi)(F);

vi.    Whether, as part of its training, Anthem made its employees aware of the fact that CMS audits had identified errors in the risk-adjustment diagnosis data submitted by Anthem, *see Swoben*, 848 F.3d at 1175 (recognizing United Healthcare's response to CMS audit findings is relevant to its *scienter*);

vii.    How Anthem chose the policies and processes it implemented for ensuring the validity of provider-submitted diagnosis codes and who made the choice; and

viii.    Whether Anthem *in fact* complied with its own policies and training in relation to the validity of provider-submitted diagnosis codes.

According to the Government, "it is not unreasonable or unduly burdensome to require

Anthem to provide testimony regarding topics directly related to its annual attestation" in which

Anthem certified its "good faith belief that the risk-adjustment data it reported to CMS, including

diagnosis codes, is [sic] 'accurate, complete and truthful.'" It is not unduly burdensome to seek

the testimony sought by topics 3(iii), 4 and 5 contained in CID 18-46, given that the Government

"accepted two significant limitations on the scope of testimony it is seeking under CID 18-46,"

namely, limiting "the number of sample beneficiaries relevant to Topic 3(iii) to four and

[limiting] the scope of all three topics to the validity of diagnosis codes submitted by service

providers or generated by Verscend as part of Anthem's retrospective chart review program."

Moreover, "Anthem is not entitled to evade potential FCA liability by imposing unreasonable

limits on CID testimony and delaying the investigation." The Government seeks testimony to

4

avoid gathering the requested information "through a slew of document requests, interrogatories, and individual depositions." The Government contends that, "due to Anthem's decision in March 2018 to stop tolling FCA claims, any delay associated with piecemeal discovery can be unfairly prejudicial insofar as such delay may curtail the Government's remedies under the statute of limitations on FCA claims."

In support of the petition, the Government submitted a declaration by its attorney, Li Yu ("Yu"), with Exhibit Nos. 1-11. In its most relevant parts, Yu states:

> The Government issued CID 18-46 in an effort to expedite this investigation and preserve certain of FCA remedies from potentially being deemed untimely. Specifically, in February and March of 2018, and in response to questions from Anthem, the Government stated that, *if* this investigation uncovers conduct and *scienter* comparable to those alleged in the pending litigation against United Healthcare, *see generally U. S. ex rel. Swoben v. United Healthcare*, 848 F.3d 1161 (9th Cir. 2016), Anthem could expect the Government to pursue FCA claims against Anthem. Following those discussions, Anthem notified the Government on March 15, 2018, that it would not extend the FCA tolling agreement that had been in place. . . . In response to this investigation, Anthem has admitted that it implemented a "retrospective chart review" program, which involved using a vendor called Verscend to identify diagnosis codes through a review of medical records for beneficiaries selected by Anthem. Anthem also has admitted that it did not implement any procedure to identify which of the provider-submitted diagnosis codes were *not* found by Verscend's medical records review. In light of these admissions, the Government now seeks testimony concerning the policies and processes at Anthem for vetting the validity of provider-submitted diagnosis codes. In the Government's view, such testimony would show whether Anthem's policies and processes complied with its certifications and the applicable regulatory requirements and also identify leads and sources of relevant information that would allow the Government to complete this investigation expeditiously. . . . For purposes of this petition, the relevant subjects are Topics 3(iii), 4, and 5 in CID 18-46. Subject to two limitations the Government voluntarily accepted on August 1, 2018, these three topics seek testimony concerning Anthem's policies, procedures, training and personnel for ensuring the validity of diagnosis codes Anthem submitted to Medicare to calculate risk-adjustment payments that Anthem received from two sources — (*i*) the provider-submitted claims data and (*ii*) the results of Verscend's retrospective review of medical records.

Exhibit No. 8 to Yu's declaration is "a letter dated August 1, 2018, that the Government sent to Anthem," stating in pertinent part:

As a starting point, we have been clear with you that this investigation is focused
on the type of conduct at issue in the *United Healthcare* litigation, *i.e.*, whether
Anthem executed its "retrospective [chart] reviews . . . deliberately to avoid
identifying erroneously submitted diagnosis codes that might otherwise have been
identified with reasonable diligence." *U.S. ex rel. Swoben v. United Healthcare
Ins. Co.*, 848 F.3d 1161, 1167 (9th Cir. 2016). Specifically, we seek to determine
whether Anthem conducted its "retrospective [chart] reviews by not causing *the
previously submitted diagnosis codes that were unsupported* by the retrospective
reviews to be corrected and withdrawn from the Government" so that "the
retrospective [chart] reviews would only increase, and not decrease, the number of
diagnoses . . . in order to increase capitated payments paid by the Government." *Id.*
at 1173-74 (emphasis added) . . . [I]n the interest of timeliness and in the hope of
obviating the need to litigate a petition to enforce, we are willing to limit the scope
of [topics 3(iii), 4 and 5 in CID 18-46] so that the deposition can be scheduled in
August. *First*, we are willing to limit our questions to the same four beneficiaries
we previously agreed on for previous topics. *Second*, we are willing to limit the
upcoming deposition to the policies, procedures, training, and personnel that
Anthem relied on to ensure the validity and supportability of diagnosis data it
submitted to CMS based on the provider-submitted claims and Anthem's
retrospective chart review program. . . . In other words, we would not be seeking
corporate representative testimony about policies, procedures, training and
personnel that Anthem used to ensure validity of the diagnosis data it submitted to
CMS as [a] result of other programs like the in-office or at-home visits.

Exhibit 10 to Yu's declaration is "a letter dated August 10, 2018, that the Government sent to

Anthem concerning Topics 3(iii), 4, and 5 in CID 18-46," stating: "As explained in our August 1

letter, whether Anthem took steps to ensure that it only obtained and retained payments from

CMS based on *valid* provider-submitted diagnosis codes is at the crux of this investigation."

## ANTHEM'S CONTENTIONS

Anthem contends that the petition should be denied because: (1) "the Government

refused to meet and confer regarding the scope of the deposition it seeks to compel"; (2) the

Government failed "to provide the notice required by Rule 30(b)(6) [of the Federal Rules of

Civil Procedure]"; and (3) "the Government's proposed topics are not proportional to the needs

of the investigation." Anthem asserts that the petition must be denied because it does not include

a certification that the Government met and conferred with Anthem "before filing this motion."

6

According to Anthem, the parties never had a telephonic or in-person "meet and confer regarding the topics at issue in this petition," and such a "meet-and confer" would not be futile because when Anthem served its objections it also "proposed affirmative testimony" that Anthem could offer related to the focus of the Government's investigation. Anthem asserts that "[t]he topics at issue in the petition are so vague and broad that they provide no meaningful boundaries or notice of what corporate testimony the government requires." Anthem maintains that it

> is a large company, with dozens of departments, more than 50,000 employees across the country, and just under one million members. Cournoyer Decl. ¶ 3. Anthem must arguably investigate and prepare testimony from nearly *all* aspects of its risk adjustment process, from the time the member visits with their healthcare provider, to the submission of that claim to Anthem through a clearinghouse and processing through Anthem's claims adjudication systems, the use of Anthem's risk adjustment filter to screen the data that is [sic] submitted to CMS, and the processes at Anthem that supplement and audit the data it has submitted to CMS. *Id.* ¶ 6-13. Indeed, in its effort to illustrate how the proposed topics are relevant to its investigation, the government demonstrates the unbounded nature of the topics by enumerating, for the first time in its petition, a non-exhaustive list of *eight* separate processes that it believes could (potentially) be included within the scope of the topic.

Anthem asserts that it "must investigate all those practices and make a subjective determination about which practices have an impact on the 'validity' and 'supportability' of diagnosis data submitted to CMS," which is a difficult task "compounded by the government's failure to even define the terms 'valid' and 'supported by the medical record.' There are different industry standards and definitions for these terms." Moreover, the Government's offer to limit testimony to four specific Anthem members is not a meaningful limitation because "[t]he practices that affect or ensure the validity of provider-submitted claims are the same regardless of whether the testimony is based on four members or four thousand." Anthem asserts it is "left to guess whether the government requires testimony regarding various business functions and practices, or whether it does not believe certain practices are responsive to the Rule 30(b)(6) notice." For

7

example, "the CID purports to require testimony from Anthem, including any 'agent,' 'representative,' 'affiliate,' or 'person acting or purporting to act on behalf of Anthem.'" However, Anthem "repeatedly raised with the government the fact that it has thousands of contracted providers, each of which may have their own practices to address the validity of the codes they provide to Anthem for submission to CMS"; thus, "[i]f the government intends for Anthem to construe the CID according to its plain language, then the practices of each of these providers are responsive to the deposition notice."

Anthem contends that "[t]hroughout its investigation of Anthem the government has consistently asserted that its investigation is focused on Anthem's chart review process, and specifically, whether Anthem compares the results of its chart review against other diagnosis codes in compliance with *Swoben*." Anthem maintains that the requested "testimony offers little benefit to the government's investigation of Anthem's potential liability," but "poses a substantial burden on Anthem given the unfocused nature of the proposed topics and the steps Anthem must take to respond." Moreover, Anthem "already provided extensive discovery regarding its chart review practices and has offered further testimony regarding the steps taken to ensure the accuracy of codes submitted for chart review." According to Anthem, the Government seeks "testimony that has no connection to Anthem's chart review program on the theory that it is somehow relevant to *Swoben*" but "never explained how the requested testimony relates to potential liability under *Swoben*." However, "the clear language of the *Swoben* decision" states that "this is not a case about whether Medicare Advantage organizations have to take affirmative steps to verify risk adjustment data," 848 F.3d at 1179, and its holding is limited "to steps Medicare Advantage plans must take to identify potentially unsupported codes *when they conduct retrospective reviews*." To the extent that the Government intends to investigate

8

Anthem's state of mind in conducting a chart review program, "there are far more direct ways to obtain information than the burdensome testimony" sought here, and the Government already "propounded a separate CID containing twelve interrogatories and eleven document requests as well as noticed seven individual depositions from Anthem employees." Anthem asserts that the requested testimony imposes a substantial burden on Anthem involving "a labor-intensive exercise that takes significant internal and external resources." Considering the Government's "refusal to provide clarity regarding the scope of what is included in its proposed topics," providing responsive testimony "is a massive undertaking that far outweighs the limited benefit to the government's inquiry."

In support of its opposition to the petition, Anthem submitted a declaration by: (1) Kristina Cournoyer ("Cournoyer"), "the Vice President of Finance at Anthem"; and (2) Anthem's attorney, James A. Bowman ("Bowman"), with Exhibits A-V. Cournoyer states that "[p]roviding comprehensive testimony on Anthem's processes that affect the quality of provider-submitted data would require investigation of numerous functional areas that interact with providers or provider-submitted data, including but not limited to the claims operations, provider contracting, healthcare analytics, program integrity, information technology ('IT'), electronic data exchange ('EDI'), special investigation unit ('SIU'), Medicare revenue and reconciliation ('MRR'), and Medicare risk adjustment regulatory compliance ('MARC') functions, as well as regional sub-teams for the East, West, and central regions." According to Cournoyer, several of these functions cover both Medicare and non-Medicare business and most have their own policies, procedures, systems and personnel, "which cannot be described by a single company representative." Cournoyer estimates, based on Anthem's experience preparing for prior depositions "in this matter, it would likely take at least a dozen employees, working a period for

9

approximately six months to prepare and provide comprehensive testimony about these processes." For example, two teams are responsible for processing claims data for submissions to CMS and each has its "own separate and unique processes targeted at improving the quality of Anthem's risk adjustment data submissions." Cournoyer contends that "some of Anthem's subsidiaries operate their own comprehensive risk adjustment programs, which employ processes similar but not identical to" Anthem's processes. Moreover, Anthem and its subsidiaries "contracted vendors and providers" who are "contractually-obligated to submit valid diagnosis data," and "[e]ach provider's circumstances and business practices are unique and Anthem does not dictate the specific steps providers must take to ensure the quality of the data they submit to Anthem." According to Cournoyer, over the last nine years, Anthem has experienced leadership and other personnel changes and Anthem's policies, procedures and systems have changed over time.

Bowman states that, in or about January 2016, he spoke to the Government's counsel "Carol Wallack, who informed us that the government was investigating whether Anthem compares the results of its retrospective chart reviews against other diagnosis codes on file with [CMS]." Since that time, the Government issued eleven CIDs to Anthem, in response to which Anthem produced thousands of documents, answered almost 50 interrogatories and presented witnesses for deposition. On June 1, 2017, at the Government's request, Anthem signed an agreement with the Government to toll the statute of limitations for any FCA claims and "other related statutes" against Anthem for approximately one year to allow the Government additional time to investigate. The Government did not request an extension of the tolling agreement, which expired "by January 1, 2018." Thereafter, Anthem declined the Government's request to extend the tolling agreement retroactively. According to Bowman, Anthem requested "to meet

10

and confer with the government (in writing and over the telephone) regarding topics 3(iii), 4, and 5 no fewer than eleven times, without success."

## GOVERNMENT'S REPLY

In reply, the Government contends that its "investigation is focused on the validity of the provider-submitted diagnosis codes that Anthem's chart review process could not corroborate." The Government maintains it is investigating "whether Anthem violated the FCA by knowingly failing to validate and, as appropriate, withdraw the provider-submitted diagnosis codes that are shown to be invalid by its chart review. Put simply, the invalid provider-submitted codes, which enable Anthem to obtain higher Medicare payments are the *false claims* that give rise to FCA liability." Anthem's argument that the investigation is not focused on the validity of the provider-submitted codes, but on "whether Anthem uses its chart review process to find potentially unsupported codes," is "inaccurate and contrary to what the Government has told Anthem," namely, that the focus of its investigation is: (a) "similar to that in the Government's ongoing litigation against United Healthcare"; (b) on "the *validity* of the diagnosis codes [Anthem] submitted based on *provider claims*"; and (c) on "whether Anthem retained Medicare payments based on the invalid provider-submitted diagnosis codes reported to CMS, which were not corroborated by chart review and yet were never corrected or withdrawn by Anthem." Since the validity of the provider-submitted diagnosis codes that Anthem reported to CMS is related to its FCA liability, testimony about the policies and procedures is relevant to enforcing CID 18-46. The Government asserts that Anthem's proportionality argument is meritless, because: (i) it is based on "the false premise that validity of provider-submitted codes is *not* a main focus of this investigation"; (ii) the Government agreed to limit the scope to four sample beneficiaries; and (iii) Anthem "ignores the economic impact of the potential fraud being investigated," as

11

"Anthem may have improperly retained upwards of hundreds of millions of dollars on account of its knowing failure to withdraw invalid provider-submitted diagnosis codes."

The Government asserts that CID 18-46 provides sufficient notice to Anthem by describing the nature of testimony sought "in plain language and with terms that Part C plan sponsors like Anthem routinely use." Anthem's claim that terms such as "valid" and "supported by medical records" are vague is undermined by Anthem's use of those terms in its "own audit procedures." In light of Anthem's annual certification obligation, Anthem's argument, that identifying the relevant policies and processes and preparing witness testimony is overly burdensome, is meritless. Moreover, Anthem "cannot abuse the 'meet-and-confer' rule to evade CID enforcement," and "written exchange can satisfy the meet and confer requirement where, as here, the exchange made each side's position clear and further meetings would serve no purpose." The Government submitted Yu's declaration in reply, with Exhibit Nos. 1-4.

## LEGAL STANDARD

The FCA provides the Government civil remedies it may pursue against any person who makes or presents, knowingly, fraudulent claims for payment to the Government. See 31 U.S.C. § 3729(a)(1). In enacting the FCA, "the objective of Congress was broadly to protect the funds and property of the Government from fraudulent claims." Rainwater v. U.S., 356 U.S. 590, 592, 78 S. Ct. 946, 948 (1958).

> Whenever the Attorney General, or a designee (for purposes of this action), has reason to believe that any person may be in possession, custody, or control of any documentary material or information relevant to a false claims law investigation, the Attorney General, or a designee, may, before commencing a civil proceeding under section 3730(a) or other false claims law, or making an election under section 3730(b), issue in writing and cause to be served upon such person, a civil investigative demand requiring such person - -
> (A) to produce such documentary material for inspection and copying,
> (B) to answer in writing written interrogatories with respect to such documentary material or information,

(C) to give oral testimony concerning such documentary material or information, or

(D) to furnish any combination of such material, answers, or testimony.

31 U.S.C. § 3733(a).

Whenever any person fails to comply with any civil investigative demand issued under subsection (a), or whenever satisfactory copying or reproduction of any material required in such demand cannot be done and such person refuses to surrender such material, the Attorney General may file, in the district court of the United States for any judicial district in which such person resides, is found, or transacts business and serve upon such person a petition for an order of such court for the enforcement of the civil investigative demand.

31 U.S.C. § 3733(j)(1).

"Whenever any petition is filed in any district court of the United States under this subsection, such court shall have jurisdiction to hear and determine the matter so presented, and to enter such order or orders as may be required to carry out the provisions of this section." 31 U.S.C. § 3733(j)(5). "The Federal Rules of Civil Procedure shall apply to any petition under this subsection, to the extent that such rules are not inconsistent with the provisions of this section." 31 U.S.C. § 3733(j)(6).

Federal courts that have addressed enforcement of civil investigative demands, including FCA civil investigative demands, have applied the judicially-created standards for enforcement of administrative subpoenas to determine whether enforcement is warranted. See Consumer Fin. Prot. Bureau v. Source for Public Data, L.P., 903 F.3d 456, 459 (5th Cir. 2018) (applying administrative subpoena enforcement standard to assess enforcement of a CID issued under 12 U.S.C. § 5562(c)(2) in connection with an investigation of violations of the Fair Credit Reporting Act); Consumer Fin. Prot. Bureau v. Accrediting Council for Independent Colleges and Schools, 854 F.3d 683, 688 (D.C. Cir. 2017) (stating, in a case involving a CID issued under 12 U.S.C. § 5562(c)(2) in connection with an investigation of violations of the federal consumer protection

13

laws: "We have treated CIDs as a form of administrative subpoena."); U.S. v. Markwood, 48

F.3d 969, 976 (6th Cir. 1995) ("Congress considered the false claims CID to be an administrative

subpoena."); U.S. v. Witmer, 835 F. Supp. 208, 213 (M.D. Pa. 1993), aff'd 30 F.3d 1489 (3d Cir.

1994) (applying standard for enforcement of administrative subpoena to assess enforcement of

an FCA CID). "The courts' role in a proceeding to enforce an administrative subpoena is

'extremely limited.'" In re McVane, 44 F.3d 1127, 1135 (2d Cir. 1995) (citation omitted). To

obtain enforcement of an administrative subpoena, the petitioner must show that: (1) "the

investigation will be conducted pursuant to a legitimate purpose"; (2) "the inquiry may be

relevant to the purpose"; (3) "the information sought is not already within the [Government's]

possession"; and (4) "the administrative steps required . . . have been followed." RNR

Enterprises, Inc. v. S.E.C., 122 F.3d 93, 96 (2d Cir. 1997) (quoting U.S. v. Powell, 379 U.S. 48,

57-58, 85 S. Ct. 248, 254-55 (1964)).

> "[A] governmental investigation into corporate matters may be of such a sweeping nature and so unrelated to the matter properly under inquiry as to exceed the investigatory power." However, "it is sufficient if the inquiry is within the authority of the agency, the demand is not too indefinite and the information sought is reasonably relevant." The respondent opposing enforcement must shoulder the burden of showing that the subpoena is "unreasonabl[e]" or was issued in bad faith or for an "improper purpose," or that compliance would be *unnecessarily* burdensome."

> Id. at 97 (citation omitted).

Courts "defer to the [Government's] appraisal of relevancy, which 'must be accepted so long as

it is not obviously wrong.'" In re McVane, 44 F.3d at 1135 (citation omitted).

> The relevance of the sought-after information is measured against the general purposes of the agency's investigation, "which necessarily presupposes an inquiry into the permissible range of investigation under the statute." An affidavit from a government official is sufficient to establish a prima facie showing that these

requirements have been met. [The Second Circuit Court of Appeals has] interpreted relevance broadly.

Id. at 1135-36 (citations omitted).

## APPLICATION OF LEGAL STANDARD

### *Whether the Investigation Will Be Conducted Pursuant to a Legitimate Purpose*

Anthem does not contend that the Government's investigation will not be conducted pursuant to a legitimate purpose. The Government's CID 18-46 indicates that: (a) it is issued pursuant to 31 U.S.C. § 3733, "in the course of a False Claims Act investigation, to determine whether there is or has been a violation of 31 U.S.C. § 3729 *et. seq.*"; and (b) the "investigation concerns Anthem, Inc.'s submission of risk adjustment claims to the [CMS] under Parts C and D of the Medicare Program." Yu explained, in his declaration, that the purpose of the Government's investigation is to ascertain "whether Anthem, as the plan sponsor of dozens of Medicare Part C insurance plans, has violated the FCA by improperly obtaining and retaining risk-adjustment payments while knowingly disregarding its duty to ensure the validity of diagnosis data it submitted to Medicare for purposes of calculating these payments." Investigating whether Anthem violated the FCA is a legitimate purpose for the investigation, contemplated by and incorporated in the FCA, including through the provision governing civil investigative demands. See 31 U.S.C. § 3733(a)(1). The Court finds that the Government established that its investigation of Anthem will be conducted pursuant to a legitimate purpose.

### *Whether the Information Sought Is Not Already Within the Government's Possession*

Anthem does not contend that the Government possesses the information sought by deposition testimony topics 3(iii), 4 and 5 contained in CID 18-46. The Court finds that the information the Government seeks to elicit through deposition testimony related to topics 3(iii), 4 and 5 contained in CID 18-46 is not already in the Government's possession.

15

## *Whether the Administrative Steps Required Have Been Followed*

Anthem does not contend that the Government failed to follow the steps required to be followed by 31 U.S.C. § 3733. Upon review of the Government's motion papers, the Court finds that the Government followed the steps in connection with CID 18-46 required to be followed by 31 U.S.C. § 3733.

## *Whether the Inquiry May Be Relevant to the Purpose of Investigation*

Anthem's memorandum of law does not contain an argument that the Government's inquiry may not be relevant to the purpose of the Government's investigation of Anthem; rather, Anthem challenges the scope of the deposition testimony topics 3(iii), 4 and 5 contained in CID 18-46, asserting that the proposed topics are not proportional to the needs of the investigation because the Government "consistently asserted that its investigation is focused on Anthem's chart review process" but topics 3(iii), 4 and 5 contained in CID 18-46 seek "testimony that has no connection to Anthem's chart review program." Anthem acknowledges that deposition testimony topics 3(iii), 4 and 5 contained in CID 18-46 are relevant to the general purpose of the Government's investigation when it argues that: (i) "this testimony offers little benefit to the government's investigation of Anthem's potential liability" but "poses a substantial burden on Anthem given the unfocused nature of the proposed topics and the steps Anthem must take to respond"; and (ii) Anthem "already provided extensive discovery regarding its chart review practices and has offered further testimony regarding the steps taken to ensure the accuracy of codes submitted for chart review." Anthem's June 29, 2018 objections to deposition testimony topics 3(iii), 4 and 5 do not include objections based on relevancy; rather, Anthem objected that deposition testimony topics 3(iii),4 and 5 are "overbroad, unduly burdensome, and not proportional to the needs of the case" and that certain terms are vague and ambiguous. The

16

communications between the Government's and Anthem's attorneys contained in the parties' submissions in connection with the petition indicate that Anthem objected, repeatedly, to the scope of deposition testimony topics 3(iii), 4 and 5, not to their relevancy to the general purpose of the Government's investigation. Upon review of the record, the Court finds that the Government's appraisal of the relevancy of the topics 3(iii), 4 and 5 contained in CID 18-46 is not obviously wrong. See In re McVane, 44 F.3d at 1135.

The inquiry at issue is within the authority of the Government, as explained above, and the deposition testimony topics 3(iii), 4 and 5 contained in CID 18-46 are not too indefinite, given that the Government limited voluntarily their scope, as articulated in the Government's letter to Anthem dated August 1, 2018, Exhibit No. 8 to Yu's declaration. The information sought by deposition testimony topics 3(iii), 4 and 5 contained in CID 18-46, as limited by the Government in its August 1, 2018 letter to Anthem, is reasonably relevant to the Government's investigation. Based upon the review of the parties' submissions and given the broad interpretation of relevancy in this circuit, see In re McVane, 44 F.3d at 1135-36, the Court finds that the information sought by deposition testimony topics 3(iii), 4 and 5 contained in CID 18-46 may be relevant to the general purpose of the Government's investigation, as articulated in the Government's CID 18-46 and explained in Yu's declaration.

The Court finds that the Government established that upholding deposition testimony topics 3(iii), 4 and 5 contained in CID 18-46 is warranted, unless Anthem can show that the topics at issue are: (a) "unreasonable"; (b) "issued in bad faith or for an improper purpose"; or (c) "compliance would be *unnecessarily* burdensome.'" RNR Enterprises, Inc., 122 F.3d at 97. Anthem does not argue that deposition testimony topics 3(iii), 4 and 5 contained in CID 18-46 are unreasonable or issued in bad faith or for an improper purpose. Anthem argues that: (1) the

17

Government "refused to meet and confer regarding the scope of the deposition it seeks to compel"; (2) the Government failed "to provide notice required by Rule 30(b)(6)"; and (3) the proposed deposition testimony topics 3(iii), 4 and 5 contained in CID 18-46 "are not proportional to the needs of the investigation" because the requested "testimony offers little benefit to the government's investigation" while "it poses a substantial burden on Anthem given the unfocused nature of the proposed topics and the steps Anthem must take to respond." Anthem's arguments are addressed below.

### *Failure to Meet and Confer Regarding the Scope of the Depositions*

Anthem contends that the petition must be denied because it "includes no certification that [the Government] met and conferred regarding the deposition topics at issue," as contemplated by Rule 37(a)(1) of the Federal Rules of Civil Procedure, without making citation to any authority mandating denial of a petition to enforce a civil investigative demand issued pursuant to 31 U.S.C. § 3733 for failure to include a meet-and-confer certification. Although Anthem is correct that the Federal Rules of Civil Procedure apply to the Government's petition "to the extent that such rules are not inconsistent with the provisions of 31 U.S.C. § 3733," 31 U.S.C. § 3733(j)(6), the FCA civil investigative demands provision does not contain a meet-and-confer certification requirement comparable to the one contained in Fed. R. Civ. P. 37(a)(1), and it provides only that "[w]henever any person fails to comply with any civil investigative demand issued under subsection (a). . . the Attorney General may file . . . a petition for an order of [the] court for the enforcement of the civil investigative demand." 31 U.S.C. § 3733(j)(1). The Court finds that importing the requirement of Fed. R. Civ. P. 37(a)(1) to "include a certification that the movant has in good faith conferred or attempted to confer with the person or party failing to make disclosure or discovery in an effort to obtain it without court action" into 31 U.S.C. §

3733(j)(1) would not be consistent with the FCA and its remedial nature, as well as the Supreme

Court's directive that the FCA "should not be given [a] narrow reading." U.S. v. Neifert-White

Co., 390 U.S. 229, 233, 88 S. Ct. 959, 962 (1968). "[W]hen governmental action does not

partake of an adjudication, as for example, when a general fact-finding investigation is being

conducted, it is not necessary that the full panoply of judicial procedures be used." Hannah v.

Larche, 363 U.S. 420, 442, 80 S. Ct. 1502, 1515 (1960).   As the instant petition does not involve

a matter of an adjudicative nature but pertains to the Government's civil investigative demand

under 31 U.S.C. § 3733, no basis exists to require the Government to comply with the

certification requirement of Fed. R. Civ. P. 37(a)(1), or to deny the petition on the basis of the

Government's failure to include such a certification.

Moreover, Anthem's contentions that: (a) the parties' written communications are

insufficient to satisfy the meet-and-confer requirement of Rule 37 of the Federal Rules of Civil

Procedure; and (b) "a telephonic or in-person meet and confer regarding the topics at issue in this

petition" is required, are not supported by citations to any binding authority.  Although numerous

letters sent by Anthem to the Government indicate Anthem's willingness "to continue our

discussions about appropriate ways to narrow the scope of Topics 2 through 5," Exhibit C to

Bowman's declaration, they also show that Anthem viewed written correspondence between the

parties as a sufficient means of meeting and conferring about the deposition testimony topics

contained in CID 18-46.  See Exhibit I to Bowman's declaration (June 28, 2018 e-mail message

from Anthem to the Government, asserting that the parties "have met and conferred extensively"

regarding certain deposition testimony topics contained in CID 18-46, but "to date you have not

addressed the concerns regarding Topics 3(iii), 4, and 5 raised in [the March 20, 2018] letter and

our multiple meet and confer discussions.").  Anthem's June 19, 2018 letter to the Government

indicates that: (1) in the "June 12, 2018 email" message to Anthem, the Government proposed that the parties "meet and confer to discuss the date, time and focus for testimony by an Anthem representative on Topics 3(iii), 4 and 5" contained in CID 18-46; and (2) since the Government has "not addressed the concerns regarding Topic 3(iii), 4, and 5 raised in [the March 20, 2018] letter and our multiple meet and confer discussions," Anthem intends "to serve its objections to the remaining deposition topics." Exhibit H to Bowman's declaration. On July 25, 2018, the Government informed Anthem, via an e-mail message, that it "sees no basis for Anthem either to arbitrarily limit the scope of its corporate representative testimony or demand that the Government accepts such arbitrary limitations in advance," but indicated that it was "not opposed to Anthem making its objection during the deposition so that matter, if necessary, can be adjudicated at the appropriate juncture." Exhibit N to Bowman's declaration. The record demonstrates that the Government engaged in good-faith meet-and-confer discussions with Anthem concerning deposition testimony topics contained in CID 18-46, taking the position that any limitation by Anthem of the scope of deposition testimony topics 3(iii), 4 and 5 contained in CID 18-46 was arbitrary. Notwithstanding the Government's position, on August 1, 2018, the Government limited the scope of deposition testimony topics 3(iii), 4 and 5 contained in CID 18-46. The Court finds that the Government engaged in good-faith meet-and-confer exercises with Anthem concerning the topics at issue in this matter; accordingly, denying the petition, on the ground of failure to meet and confer regarding the scope of deposition testimony topics, is not warranted.

### *Failure to Provide Notice Required by Rule 30(b)(6)*

Anthem contends that the topics at issue are "vague and broad," provide "no meaningful boundaries or notice of what corporate testimony the government requires," and the Government

20

failed to define the terms "valid" and "supported by the medical record." The Court is not

convinced that sustaining Anthem's objections that deposition testimony topics 3(iii), 4 and 5

contained in CID 18-46 are vague and ambiguous is warranted because certain terms "are not

defined and subject to varying interpretations." More specifically, Anthem's contention that the

terms "valid" and "supported by the medical record" are vague and ambiguous because "[t]here

are different industry standards and definitions for these terms," is unsupported by evidence and

contradicted by Anthem's audit procedures which include the same terms when directing that

Anthem's "medical record auditors" and "training consultants" review "the medical records to

ensure that all diagnostic codes captured on the Member/Diagnoses Data Extract File t and

included in the sample are validated and supported by the medical record." Exhibit No. 3 to

Yu's reply declaration.

Anthem contends that deposition testimony topics 3(iii), 4 and 5 contained in CID 18-46

do not describe the matters for examination with reasonable particularity because Anthem "is left

to guess" whether the practices of Anthem's "thousands of contracted providers" are responsive

to the topics at issue purporting to require testimony "from Anthem, including any 'agent,'

'representative,' 'affiliate,' or 'person acting or purporting to act on behalf of Anthem.'"

Anthem failed to explain the basis for believing that the terms "'agent,' 'representative,'

'affiliate,' or 'person acting or purporting to act on behalf of Anthem'": (a) mean more than what

they say; or (b) include Anthem's "contracted providers."

In light of the nature of the petition, made pursuant to 31 U.S.C. § 3733, and the broad

interpretation of relevancy, the Court finds that deposition testimony topics 3(iii), 4 and 5

contained in CID 18-46 describe with reasonable particularity what information is sought and

provide Anthem with sufficient notice about the topics that will be the subject of the requested deposition testimony.

***Whether the Proposed Topics Are Proportional to the Needs of the Investigation***

Anthem contends that the proposed topics are not proportional to the needs of the investigation because they impose "a substantial burden on Anthem given the unfocused nature of the proposed topics and the steps Anthem must take to respond." Anthem repeats its relevancy argument asserting that the requested "testimony has no connection to Anthem's chart review program." As explained above, Anthem's argument that the topics at issue are irrelevant is rejected as meritless. Anthem does not make citation to any authority for or provide any evidence to support its proposition that the topics at issue are not proportional to the needs of the investigation because "there are far more direct ways to obtain that information than the burdensome testimony the government seeks here." Moreover, the size and structure of Anthem, namely, its numerous departments, business units and functions that interact with provider-submitted data and the number of its Medicare Part C members are not sufficient, without more, to establish that the topics at issue are not proportional to the needs of the investigation, especially in light of Anthem's annual certification obligation concerning the accuracy and truthfulness of its risk-adjustment diagnosis data to CMS, see 42 C.F.R. § 422.504(l), and the economic impact of the potential fraud that is being investigated. Although Cournoyer in her declaration described, in general terms, Anthem's size and structure, she failed to provide any specific facts, examples or details in support of her contention that "it would likely take at least a dozen employees, working a period of approximately six months, to prepare and provide comprehensive testimony about these processes." The Court finds that Anthem failed to show

22

that Anthem's compliance with the deposition testimony topics 3(iii), 4 and 5 contained in CID 18-46 would be unnecessarily burdensome. See RNR Enterprises, 122 F.3d at 97.

## RECOMMENDATION

For the foregoing reasons, I recommend that: (1) the Government's petition, Docket Entry No. 1, be granted; and (2) a date be set for the respondent's witness to testify.

## FILING OF OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report to file written objections. See also Fed. R. Civ. P. 6. Such objections, and any responses to objections, shall be filed with the Clerk of Court, with courtesy copies delivered to the chambers of the Honorable George B. Daniels, 500 Pearl Street, Room 1310, New York, New York, 10007, and to the chambers of the undersigned, 40 Centre Street, Room 425, New York, New York, 10007. Any requests for an extension of time for filing objections must be directed to Judge Daniels. *Failure to file objections within fourteen (14) days will result in a waiver of objections and will preclude appellate review.* See Thomas v. Arn, 474 U.S. 140, 106 S. Ct. 466 (1985); Cephas v. Nash, 328 F.3d 98, 107 (2d Cir. 2003).

Dated: New York, New York
       November 13, 2018

Respectfully submitted,

Kevin Nathaniel Fox

KEVIN NATHANIEL FOX
UNITED STATES MAGISTRATE JUDGE